625 A.2d 326

**RICHWIND JOINT VENTURE 4, et al.**

v.

**Ernestine BRUNSON, Individually, etc.**

**No. 1384, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

June 2, 1993.

Revised and Refiled Sept. 7, 1993.

**332**

Denise Ramsburg Stanley (Donald C. Allen and Allen, Johnson, Alexander & Karp, on the brief), Baltimore, for appellants.

C. Christopher Brown (Joseph B. Espo and Brown, Goldstein, & Levy, on the brief), Baltimore, for appellees.

Argued before BISHOP and HARRELL, JJ., and JAMES P. SALMON, Specially Assigned Judge.

BISHOP, Judge.

Barbara Richardson ("Richardson") filed a complaint in the Circuit Court for Baltimore City individually and on behalf of her minor children, Jamika and Jamall Holman ("Jamika" and "Jamall"), against Rita Baitch ("Baitch"), individually and as personal representative of the estate of Harry Baitch (jointly referred to as "the Baitches"), and Appellants, Richwind Joint Venture 4 ("Richwind") and Scoken Management Corporation ("Scoken"). Richardson sought damages for injuries that resulted from her children's exposure to lead-based paint. The complaint alleged negligence (counts I and II), nuisance

(counts III and IV), and violations of the Consumer Protection Act ("the Act") (counts V and VI). When Richardson died, her mother, Ernestine Brunson ("Brunson"), Appellee, who was appointed personal representative of Richardson's estate, was substituted as plaintiff.

Before trial, Brunson and Baitch entered into a settlement agreement. Baitch agreed to pay Brunson $35,000 in exchange for the Baitches being released from all claims against them. The court ordered the case against the Baitches dismissed with prejudice. The court dismissed counts III and IV, and at the close of Brunson's case, it granted Appellants' motions for judgment on counts V and VI. The jury awarded damages to Jamall in the amount of $252,000, Jamika in the amount of $247,500, and the court awarded damages to Richardson's estate in the amount of $18,944. The court denied Appellants' motions for a new trial or remittitur. Appellants filed a timely notice of appeal; Brunson filed a cross-appeal.

## Issues

Appellants present the following issues for our review:

I. Whether the court erred when it admitted expert testimony of average IQ loss of children affected by lead poisoning when Jamall's and Jamika's IQ's increased after sustaining lead poisoning.

II. Whether the court erred when it permitted a psychologist to testify regarding the children's brain damage.

III. Whether the court erred when it admitted into evidence an economist's report on the children's future lost earning capacity.

IV. Whether the court erred when it permitted impeachment of Scoken with evidence of lead paint violations at locations other than the children's residence.

V. Whether the court erred when it refused to admit Department of Social Services records.

VI. Whether the court erred when it denied a mistrial after Brunson's counsel stated during opening argument that the mere presence of lead paint is illegal.

VII. Whether the court erred when it denied defense counsel's motion for judgment.

VIII. Whether the court erred when it refused defense counsel's requested jury instructions on contributory negligence and intervening and superseding causation.

IX. Whether the court abused its discretion when it denied defense counsel's motion for a new trial.

### Cross–Appeal

Brunson asks us to decide whether the court erred when it granted Appellants' motions for judgment as to Brunson's claim under the Act.

### Facts

Baitch and her husband owned a residential building located at 2119 West Fairmount Avenue in Baltimore City ("the Building"). In November 1983, the Baitches rented the Building to Richardson, as the latter's residence. While a resident of the Building, Richardson gave birth to her daughter, Jamika, on March 18, 1984, and her son, Jamall, on March 13, 1985. Jamika and Jamall resided with their mother in the Building until January 1987.

In December 1985, Richwind purchased the Building, and in January 1986, Mark Chodak ("Chodak"), Scoken's president, assumed management of the Building until January 1987.

On January 17, 1986, Richardson complained to Chodak that paint was peeling from the walls within the Building. In response, Chodak sent a repairman whose work order indicated that the "job was completed," but Chodak did not otherwise know if the condition was remedied. Chodak hired no one— either before or after taking over management of the Building—to inspect the property for lead-based paint. Although Chodak did not recall the exact dates, he testified that he visited the Building during the day sometime between January 1986 and September 1986. Chodak knew the walls within the Building were covered with lead-based paint. He knew also, based on his prior experience as a housing inspector and

property manager in Baltimore City, that peeling lead-based paint could be hazardous to children. Chodak did not warn Richardson of the dangers of flaking, peeling lead-based paint, or of the presence of lead in the Building. He testified that he did not know children lived in the Building.

On August 12, 1986, Jamika—then twenty-nine months of age—and Jamall—then seventeen months of age—both tested positive for lead poisoning. Doctors determined that the level of lead discovered in Jamall's blood put him at high risk of injury, and consequently, he was hospitalized. Both children were later diagnosed with brain damage as a result of their exposure to the lead poisoning. On September 22, 1986, health inspectors notified Chodak of forty-two lead violations on the interior and exterior surfaces of the Building. Additional facts will be included in the discussion, *infra*, where necessary.

## *Discussion*

### *I.*

Appellants first contend that the court erred when it admitted expert testimony regarding average IQ loss among children exposed to lead poisoning. Appellants claim Brunson's counsel did not establish a reliable basis for the expert's opinion regarding Jamall's and Jamika's brain damage since other factors contributed to their injury—Richardson's alcoholism and diabetes; her continued alcohol consumption during her pregnancy with Jamall; her premature delivery of Jamika, whose birth weight was about four pounds; and the children's allegedly poor "home environment." They further argue that the expert's conclusion that the children "lost something" and that Jamall is "not as smart as [he] would have been without the lead" is inadmissible because it lacks "certainty" and "specificity." We disagree.

Under Maryland law,
the standard for the admissibility of expert evidence is whether the finder of fact can receive appreciable help from an expert on the subject matter. No longer need the

subject matter be so far "beyond the ken of laymen" that the finder of fact could not have any understanding of the particular issue without expert help.

6 Lynn McLain, *Maryland Practice* § 702.1 (1987) (citations omitted). "The admissibility of expert testimony is largely within the discretion of the trial court." *Ali v. State,* 67 Md.App. 339, 346, 507 A.2d 648 (1986), *aff'd,* 314 Md. 295, 550 A.2d 925 (1988). "Seldom will the decision in this regard constitute grounds for reversal." *Simmons v. State,* 313 Md. 33, 43, 542 A.2d 1258 (1988). "[T]he proposed expert testimony must be competent, that is, the expert's conclusions must be based upon a legally sufficient factual foundation. Ideally, the expert will testify from first-hand knowledge, such as that gained from a personal examination of an individual...." *Id.* at 41–42, 542 A.2d 1258.

In the case *sub judice,* Dr. Julian Chisolm, a pediatrician at Kennedy–Kreiger Institute, was qualified, without objection from Appellants, to testify as an expert to the existence, causes, and consequences of lead exposure in children, and the treatment of children so affected. Dr. Chisolm explained for the jury the general effect lead poisoning has on a child's learning process.

> I think, if we are dealing with what might be called low level or moderate level lead exposure in which we don't see any symptoms, the child doesn't vomit, he doesn't have belly pains or any serious thing, he at least appears to be well, the main affect [sic] of that is learning disability, and that's been demonstrated, I think, in a number of studies around the world. You are really not able to demonstrate this until they reach school age. All of the damage is being done when they're much younger.

Dr. Chisolm explained that the main way in which the amount of lead in a child's body is measured is in the blood. He then provided testimony regarding the loss of IQ as a result of a child's ingestion of lead.

> [A]s the average blood lead concentration increases above the baseline of ten, for every ten microgram increment, in

the various studies that have been published, you get a loss, an average loss, in large groups of children of about four points on the IQ

So you would expect that all other things—and in these studies, other things are taken into account, how good the mothering is, how old the mother is, is it the first baby, so forth and so on. The main thing is the nurturing the child gets. It appears you lose, on average, about four points on the IQ, and that's been pretty consistent, I would say, around the world.

With regard to the research upon which he based his testimony, Dr. Chisolm explained:

The studies are designed to exclude obvious things. They would exclude gross prematurity, two pound babies, for example, and they would exclude other obvious things. I think if a child—if some children get hit on the head, as you say, that child might be excluded or the data would be analyzed with and without him.

Dr. Chisolm testified that the 1991 United States Center for Disease Control guidelines set the maximum acceptable level of lead in the blood at ten micrograms per deciliter. He explained that the level of lead in Jamall's blood reached fifty-nine micrograms per deciliter in September 1986. He then proceeded to testify as to the specific effect of lead poisoning on Jamall's IQ.

I would think that he probably, if we judge these blood leads over these first three years or so of life, one would say that he probably had lost eight to ten [IQ] points, but I would knock that down on two accounts.

One, his mother is diabetic, and two, there is evidence in the record that she was alcoholic, so we have to take that into account, and I think I knocked that down to maybe six to eight [IQ] points.

Appellants' counsel did not object to the testimony. Dr. Chisolm testified that Jamika had thirty-six micrograms per deciliter of lead in her blood. He explained that Jamika

might have lost, all other things being equal, perhaps seven to eight [IQ] points, but we have to knock that down, again, because of her mother's probable deficiencies.

And so I think I estimated four to no more than six [IQ] points.

Again, Appellants did not object to counsel's inquiry. We find that Appellants did not preserve this issue for our review since at no time did they object to the testimony. *See* Rule 2–517(a), 8–131(a).

Because we believe that this is an issue that will arise in the future, we exercise our discretion and address it at this time, even though it was not preserved. The court did not abuse its discretion when it allowed Dr. Chisolm to testify as to average IQ loss among children suffering from lead poisoning. Any reference to studies of average IQ loss—while not dispositive of the children's injuries—offered "appreciable help" to the jury to determine the extent of the injuries Jamall and Jamika sustained, and was not mere conjecture or speculation. McLain, *supra,* § 702.1; *see, e.g., Lumber Terminals, Inc. v. Nowakowski,* 36 Md.App. 82, 92, 373 A.2d 282 (1977) ("[E]vidence of the present value of future lost earnings is not improper *per se,* and when offered, may be a valid consideration by the jury."); *cf. Byrum v. Maryott,* 26 Md.App. 130, 134, 337 A.2d 142, *cert. denied,* 275 Md. 753 (1975) (" '[c]ertainly evidence tending to show only a *possibility* of permanency is not sufficient to take that issue to the jury.' " Based on his expertise, as well as his evaluation of each child, Dr. Chisolm testified that Jamall and Jamika ingested lead into their blood in quantities sufficient to cause brain damage. He also gave the opinion that the children ingested lead-based paint while residing in the Building. Further, Dr. Chisolm fully considered the effect of other factors, such as the mother's alcoholism and the children's home environment, on the children's IQ loss. *See Simmons,* 313 Md. at 43, 542 A.2d 1258; *see also* McLain, *supra,* § 703.1 ("The basis for an expert's opinion must suffice to support a reasonably accurate conclusion."). Accordingly, had there been a timely objection, we would still have held that the court did not abuse its discretion.

*II.*

The court refused to qualify Dr. Barry Hurwitz, a psychologist, as an expert on the issue of medical causation. Appellants claim that the court erred when it did permit Dr. Hurwitz to testify to damage to certain parts of the brain caused by the lead poisoning. Appellants assert that Dr. Hurwitz's testimony was not relevant since Dr. Chisolm—the only expert qualified to testify as to causation—determined that the children did not suffer any brain damage. As a result, they maintain the testimony confused and misled the jury. We disagree.

There is a "long-standing principle that the admission or exclusion of evidence is a function of the trial court which, on appeal, is traditionally viewed with great latitude." *Ellsworth v. Sherne Lingerie, Inc.,* 60 Md.App. 104, 118, 481 A.2d 250 (1984), *rev'd on other grounds,* 303 Md. 581, 495 A.2d 348 (1985). "An appellate court will only reverse upon finding that the trial judge's determination was 'both manifestly wrong and substantially injurious.'" *Lomax v. Comptroller of the Treasury,* 88 Md.App. 50, 54, 591 A.2d 1311 (1991) (*quoting Paige v. Manuzak,* 57 Md.App. 621, 633, 471 A.2d 758, *cert. denied,* 300 Md. 154, 476 A.2d 722 (1984)). During cross-examination, Appellants' counsel directed Dr. Chisolm to consider Kennedy–Kreiger Institute records and other data that showed that in 1990 Jamika had an IQ of 87, and in 1991, an IQ of 113, and that Jamall's IQ increased from 94 in 1990 to 107 in 1991. Counsel questioned whether it would be impossible to assign brain damage to children whose IQ subsequently improved.

[Counsel]: Isn't it true, based on that, that it would not be possible to assign any brain damage to these two children?

[Dr. Chisolm]: I think you could still say—one of the things that corroborates that is they were both reading at or above grade level on the wide range achievement test, so it's quite consistent with that.

I'd still have to say that they would have been a little smarter.

Dr. Chisolm testified, during cross-examination, that, although each child's IQ increased, they still "would have been a little smarter" without being exposed to lead. Moreover, putting this testimony in its proper context, at the time Jamall's and Jamika's IQ's were tested, they were living in South Carolina with their grandmother, and Dr. Chisolm posited that the new environment "stimulated" the children. At no time did Dr. Chisolm concede that the children *did not* suffer brain damage. Indeed, during his direct examination, Dr. Chisolm testified extensively that, but for their being exposed to lead poisoning, the children's IQ's would be higher. The court ruled that Dr. Hurwitz was qualified to testify as an expert "strictly" within the area of psychology, and [could] render an opinion regarding neuropsychological testing and their results." Dr. Hurwitz testified that, based on his expertise, both children suffered brain damage.

On two occasions, Appellants' counsel directly solicited from Dr. Hurwitz additional references to blood lead levels. Appellants' counsel explicitly asked:

Now, the studies that Doctor Needleman, for instance, has done, and which you have relied upon in the past have indicated that half of the children with *elevated lead levels* may have a problem, isn't that true?

(Emphasis added).

We hold that the court correctly admitted the testimony into evidence. Contrary to Appellants' bald assertion, Dr. Chisolm's testimony, in its entirety, was that exposure to lead more likely than not caused the children to suffer brain damage. *See Byrum,* 26 Md.App. at 134, 337 A.2d 142; McLain, *supra,* § 702.1. Dr. Hurwitz opined that Jamall and Jamika were brain damaged. Any references to lead poisoning by Dr. Hurwitz, assuming *arguendo* that his remarks were improper, were of *de minimis* effect. Moreover, Appellants solicited similar testimony and thereby waived any objection. *See* Rule 8–131(a).

### III.

Appellants suggest that the court committed reversible error when it admitted into evidence an economist's report that projected the children's future incomes. They maintain that, since Jamall and Jamika did not suffer permanent injury or "specific IQ loss," the report was "irrelevant, unreliable, and misleading." They also argue that, assuming *arguendo* the children did suffer permanent injury, any projection of future earning capacity constitutes "conjecture" and "speculation." We conclude that Appellants waived their objection to the admission of this testimony. *See* Rule 8–131(a). Appellants stipulated without objection to the report's admissibility they now contest. Thus, we need not address the merits of this issue.

### IV.

■ Appellants suggest the court committed reversible error when it permitted Brunson's counsel to impeach Chodak with notices of four lead-based paint violations at locations other than the Building. They argue Chodak's testimony—that he was unaware of the dangers of lead-based paint, and specifically, the harm it causes children—was not inconsistent with his deposition testimony. Since Chodak was an adverse witness, and therefore, "[Brunson's] theories as to the basis for [Chodak's] alleged knowledge were amply in evidence," Appellants further contend the impeachment was cumulative and unduly prejudicial. We disagree.

Under Maryland law, a witness may be impeached by cross-examination to show that the witness previously made a statement . . . in a way inconsistent with his . . . testimony relevant to the case. The statement . . . must contradict the trial testimony either expressly or by omission. The contradiction or inconsistency must be significant. The inference then may be made that the witness could not have been correct both times and may be wrong at trial either because of faulty memory or deliberate prevarication.

McLain, *supra,* § 613.1 (footnotes omitted); *see also Bane v. State,* 73 Md.App. 135, 154, 533 A.2d 309 (1987) ("a witness may be impeached by cross-examination to show that the witness previously made a statement contrary to the one made on the witness stand"); *cf. Eagle–Picher Indus., Inc. v. Balbos,* 84 Md.App. 10, 88–89, 578 A.2d 228 (1990), *modified,* 326 Md. 179, 604 A.2d 445 (1992) (a witness's prior inconsistent statements are not admissible for impeachment purposes when the only testimony at trial is in the form of a deposition and counsel does not call the deponent to the stand and confront him with the prior statements).

Appellants filed a motion *in limine* to exclude evidence of housing code violations at any locations other than the Building. Before trial, the court heard argument on the motion. The court deferred ruling on the motion.

During direct examination, Chodak denied knowing that exposure to lead can cause children to experience learning problems. The testimony was as follows:

Q: Isn't it a fact, Mr. Chodak, that at least at some time prior to January 1986, you had read in the newspapers that there was a problem with lead based paint?

A: Yes.

Q: And isn't it a fact, furthermore, that you knew that that caused injuries to children, lead based paint?

A: I think that what it caused to children was something I wasn't quite sure of. I'm not really—I am not a pysician [sic], so I don't really know what, if any, injuries it causes to children.

Q: Isn't it a fact that you know that it can cause learning problems in children and that it can be potentially serious?

A: Are you asking me if I know that or if you know that?

Q: Did you know that at the beginning of the year 1986?

A: I don't know if I did know that.

Q: Do you recall having a deposition taken in April of 1988?

A: Yes, I do. In April of 1988? Yes. Yes.

Q: And in that deposition I asked you the following question, we were focusing on a period earlier than we are now. "Would you please tell us what your understanding prior to October of 1983 was of the affect [sic] lead based paint ingested by kids could have on kids?" Your answer at that time was, and I quote you—and you were under oath at that time?

A: Yes.

Q: "My understanding was that it could cause learning problems in children, that the damage could be potentially serious, and that it could be depending on the levels of lead, that it could cause irreparable damage." Now you said that you had that knowledge prior to 1986 at one point in time. You [sic] saying something different now, or do you acknowledge—

A: I think if you will go to my deposition in this particular case, sir, you will note in that deposition that I—you asked me that question again, and I asked—I informed you at that time—it's in the deposition, that I thanked you for asking me that question again because I reflected on that answer, and it was an incorrect answer that I had given you back in 1988, and that I rephrased my answer to that question in the current deposition.

\* \* \* \* \* \*

Q: What is the corrected version of what your knowledge was?

A: The corrected version is in the deposition which I gave you in this case, which is that I did not know what injuries could be caused to children.

\* \* \* \* \* \*

Q: Are you saying that when you were deposed under oath in 1988 and said you knew before in 1986 that lead can cause irreparable, that means you can't fix it, injury in kids, you were wrong?

A: I was wrong in that answer, yes.

Q: But you are right now in saying you didn't really know for sure what harm it caused?

A: That's correct.

At that point in the examination, and based on Chodak's testimony, counsel again requested the court to deny Appellants' motion *in limine*, and to allow into evidence the violation notices. The court denied the motion.

Counsel then proceeded to offer into evidence "Emergency Violation Notice[s] and Order[s] to Remove Lead Nuisance from a Property Located at" (1) 1950 Perlman Place, dated November 22, 1985; (2) 1410 Holbrook Street, dated July 1984; (3) 937 North Washington Street, dated August 11, 1983; and (4) 2227 East Biddle Street, dated July 10, 1981. Each notice contained the following language:

> It has been determined ... from blood level results and investigation by the Baltimore City Health Department that a child who frequents the above dwelling has an abnormal blood lead level. An inspection of this dwelling shows it contains lead based paint. Such condition has been deemed by the Commissioner of Health to be hazardous to life and health and public health nuisance.

The court instructed the jury:

> This evidence has been introduced not for the purpose of establishing that because one piece of property managed by Scoken had lead violations other properties of Scoken had lead violations. It is not being offered for that purpose. It is being offered strictly for the purpose of determining whether Mr. Chodak, the present witness, had knowledge of the possible dangers of lead paint.

Counsel then solicited testimony from Chodak that he knew in 1986 that older houses, those built before 1957, contained lead-based paint; that the Building is old; and that peeling lead-based paint was dangerous to children.

We hold that the court did not abuse its discretion when it admitted into evidence the four notices, as well as testimony that Chodak received other such notices. Chodak's deposition

was flatly inconsistent with his trial testimony and, therefore, counsel's impeachment by way of showing that he received four notices of lead nuisance violations was proper. Moreover, what Chodak knew or should have known with regard to the possible dangers of lead-based paint to children was highly probative of whether Appellants were on notice of the dangerous condition, and negligently failed to warn the tenants of hazards within the Building. The court further cautioned the jury that the evidence of the prior notices was not being offered substantively but, rather, to assist the jury in determining whether Appellants did, in fact, have knowledge of the potential danger of lead-based paint to the children.

Finally, Appellants argue that the court erred when it allowed counsel to question Chodak about the illegality of "intact" paint as opposed to "peeling" paint. In light of our discussion in Section *VI., infra,* we hold that counsel's inquiry, although arguably irrelevant, was not "substantially injurious" to Appellants. *See Lomax,* 88 Md.App. at 54, 591 A.2d at 1312–13. Thus, reversal is not warranted.

## V.

Appellants next insist that the court abused its discretion when it refused to admit into evidence Department of Social Services ("DSS") records. Appellants claim evidence of Richardson's alleged abusive home environment was relevant to their theory that factors other than exposure to lead contributed to the children's injuries. They contend, therefore, that disclosure of social services records was "imperative" to an effective cross-examination of Dr. Chisolm. We disagree.

Brunson filed a motion *in limine* to exclude DSS records concerning Richardson's suspected abuse of her older son, Benjamin, and unsubstantiated allegations of her neglect of Jamall and Jamika. Before ruling on the motion, the court asked defense counsel if he intended to offer into evidence records pertaining to her suspected abuse of Benjamin. Counsel replied:

*No, sir, not as to Benjamin Richardson.* However, the other information, I think, is relevant because it tends to show the chaotic condition of the household in which these

children lived, which, under the evidence that will be presented, will be significant in terms of their development. (Emphasis added). The court then granted the motion only as to records relating to alleged abusive incidents involving Benjamin. Appellants waived the issue of the admissibility of the record relating to specific references of the alleged abuse of Benjamin. *See* Rule 8–131(a).

The court subsequently granted the motion with regard to an unsubstantiated allegation of the mother's neglect of Jamall and Jamika. Appellants concede that the court properly exercised its discretion when it excluded the record "as to the neglect charge." *See Zaal v. State,* 326 Md. 54, 76 n. 10, 602 A.2d 1247 (1992) (the privacy interest of education records of students "certainly is not so strong as the privacy interest protected by the statute" protecting [the disclosure of child abuse records]; *State v. Runge,* 317 Md. 613, 620–21, 566 A.2d 88 (1989) (" '[t]he statute was never intended to be a vehicle to permit the willy-nilly disclosure of the very records the Legislature sought to keep confidential.' ")

Appellants' contention is, therefore, limited to the court's exclusion of "other records" that indicate that Richardson was a diabetic and an alcoholic and that the children's home environment was in a state of turmoil. The record shows two social services files were offered into evidence. Exhibit ten contains the record that addresses the alleged abuse of Benjamin; exhibit eleven contains the record that addresses the alleged incidents of child neglect. Appellants failed to direct this Court to the specific portions of the records within these two files that support their assertion. *See* Rule 8–504(a)(4). Since Appellants concede on appeal that the court was correct when it excluded the records as to the "neglect charge," we will not examine exhibit eleven any further to decide this issue. *See* Rule 8–504(c).

■ We conclude that Appellants meant to direct us to parts of exhibit ten to support their assertion that, other than general references to the abuse of Benjamin, Richardson maintained an unstable home environment to the detriment of

the children's development. The report shows that the disposition indicated by the social worker was that the family needed supportive services, but on April 11, 1980, since there were no further allegations of neglect or abuse, the case was closed. The court properly refused to admit the record into evidence. *See Zaal,* 326 Md. at 76, 602 A.2d 1247. Richardson's privacy interest was *not* outweighed by the need to disclose the report, particularly since the situation addressed in the report was dated about five years prior to the time the children ingested lead, and the case was closed soon thereafter.

Further, Dr. Chisolm fully considered the effect of Richardson's dysfunction and alleged chaotic home environment on the children's development, as discussed in Section *I, supra.* To this extent, admitting the evidence would have been cumulative. *See* McLain, *supra,* § 611.2 ("The trial court, in its discretion, may exercise reasonable control over the examination of witnesses and the presentation of evidence, so as to avoid needless consumption of time....").

## *VI.*

Appellants complain that the court erred when it denied defense counsel's request for a mistrial and for a cautionary instruction to the jury after Brunson's counsel allegedly misstated the law during opening argument. Specifically, Appellants argue that they were prejudiced when counsel stated that the mere presence of lead paint was illegal. We disagree.

Brunson's counsel stated during opening argument:

Mr. Chodak knew what housing violations—what housing code violations were. He knew that peeling paint in a house, as was found to be in this house, was a housing code violation.

> He knew that it was *illegal to have lead* in a house.
>
> He knew that it was illegal to expose children—

(Emphasis added). The court overruled Appellants' objection, and subsequent request for a mistrial. Counsel continued:

> He knew ... that *peeling paint* exposes lead to anyone who is nearby to eat it, such as children.

(Emphasis added).

Assuming, without deciding, that counsel's reference to the illegality of *intact* lead-based paint was a misstatement of the law, the court did not abuse its discretion when it denied Appellants' motion for a mistrial. " 'It has been repeatedly held that a trial judge shall declare a mistrial only under extraordinary circumstances and where there is a manifest necessity to do so.' " *Leak v. State,* 84 Md.App. 353, 357–58, 579 A.2d 788 (1990) (*quoting Russell v. State,* 69 Md.App. 554, 562, 518 A.2d 1081 (1987)). "The decision of whether to grant a mistrial is vested in the discretion of the trial judge and will not be disturbed on appeal unless there was clear prejudice to the defendant." *Tibbs v. State,* 72 Md.App. 239, 249, 528 A.2d 510 *cert. denied,* 311 Md. 286, 533 A.2d 1308 (1987).

In the case *sub judice,* the record does not "compellingly demonstrate sufficient prejudice to warrant granting such a drastic measure." *Leak,* 84 Md.App. at 358. The comment had no bearing on the case; the condition in the Building that caused Jamika's and Jamall's poisonings was *peeling,* not intact, lead-based paint. The court instructed the jury as follows:

> Now, in order for the plaintiffs to recover on the theory of negligence, they must prove by a preponderance of the evidence each of the following elements:....
>
> That the defendants property contained *chipping, flaking and/or peeling paint* in violation of the Baltimore City

ordinances during their ownership, operation or management.

\* \* \*

That the failure to remove or abate the *defective* paint following the notice proximately caused the plaintiffs' injuries.

Now, a landlord and/or his agent have the duty to keep a dwelling in good repair, safe condition and fit for human habitation.

Included within this duty is the obligation to keep all walls, ceilings and woodwork free of any *flaking, loose or peeling paint* and wallpaper.

Now, the violation of the statute which is causally related to the incident or damages complained of is evidence of negligence.

If you find from the evidence that there was a violation of a statute which is causally related to the accident, you may consider this violation as evidence of negligence.

(Emphasis added). Thus, the jury's verdict was based solely on its finding that Appellants were negligent with regard to *peeling* lead-based paint, not merely the presence of lead-based paint. Any prejudice to Appellants resulting from counsel's comment was, at most, *de minimis*.

Appellants also claim the court committed reversible error when it refused to give a cautionary instruction. Appellants' counsel waived the issue. *See* Rule 8–131(a) ("the appellate court will not decide any other issue unless it *plainly appears by the record* to have been raised in or decided by the trial court"). The record shows that Appellants agreed with the court when it stated that its instruction covered Appellants' proposed cautionary instruction.

### VII.

It is undisputed that Appellants never warned Richardson about the dangers of exposure to lead poisoning. Appellants complain, however, that the court erred when it denied their motion for judgment on the basis that Richardson failed to prove negligence. Specifically, they maintain there was insufficient evidence that 1) Appellants had notice of a defective

condition within the premises, and a reasonable opportunity to correct the condition; and, 2) the children suffered brain damage as a result of being exposed to lead poisoning. We disagree and explain.

Rule 2–519(b) provides:

When a defendant moves for judgment at the close of the evidence offered by the plaintiff [in a jury trial] ... the court shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made.

*See also Pahanish v. Western Trails, Inc.,* 69 Md.App. 342, 353, 517 A.2d 1122 (1986) (emphasis in original). This rule "requires submission of a case to the jury if there be *any* evidence, however slight, legally sufficient as tending to prove negligence, the weight and value of such evidence being left to the jury. And meager evidence of negligence is sufficient to carry the case to the jury." *Ralph Pritts & Sons, Inc. v. Butler,* 43 Md.App. 192, 200, 403 A.2d 830 (1979) (citations omitted) (emphasis in original).

"A claim of negligence requires the existence of four elements: (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; (3) a legally cognizable causal relationship between the breach of duty and the harm suffered; and (4) damages suffered by the plaintiff." *Yousef v. Trustbank Savings, F.S.B.,* 81 Md.App. 527, 535–36, 568 A.2d 1134 (1990); *see also Owens–Illinois,* 87 Md.App. at 716, 591 A.2d 544.

[T]he violation of a statute does not constitute negligence *per se.* Rather, the breach of a statutory duty may be considered some evidence of negligence where three requirements are met. First, the plaintiff must be a member of the class of persons the statute was designed to protect. Second, the injury suffered must be of the type the statute was designed to prevent. Third, the plaintiff must present legally sufficient evidence to demonstrate that the statutory violation was the proximate cause of the injury sustained.

*Pahanish,* 69 Md.App. at 362, 517 A.2d 1122 (citations omitted).

The Baltimore City Code, Article 13, § 701–708 (1983) sets forth general requirements relating to safety and sanitary maintenance within dwellings. Section 702 requires that dwelling units be "fit for human habitation." Section 703(1)(e) provides that "[e]xterior wood and ferrous metal surfaces shall be protected ... against decay by paint or other protective coating." With regard to a building's interior, § 703(2)(c) provides that "[a]ll walls, ceilings, woodwork, doors and windows shall be kept clean and free of any flaking, loose or peeling paint and paper." Further, Baltimore City's Code of Public Local Laws, § 9–14.1(a) establishes:

In any written or oral lease or agreement for rental of a dwelling intended for human habitation, the landlord shall be deemed to covenant and warrant that the dwelling is fit for human habitation.

"Although there is no special duty where young children are involved, there may be a *higher degree of care* when compared with that degree required to adults." *Medina v. Meilhammer*, 62 Md.App. 239, 250, 489 A.2d 35, *cert. denied*, 303 Md. 683, 496 A.2d 683 (1985) (emphasis added).

In the case *sub judice*, Chodak testified that he knew lead-based paint was present in many old houses in Baltimore, including the Building. He knew of the likelihood of peeling, lead-based paint within the premises, and was also aware of the hazards associated with exposure to lead. Indeed, before assuming management of Richardson's residence, he was notified of lead-based paint violations at four other rental properties. Further, he knew that lead-based paint was particularly dangerous to children. He explained that "intact" lead based-paint—as opposed to peeling lead-based paint—is not as "accessible" to children, and therefore, not as hazardous.

Weinrich, Richwind's manager in 1986, testified that, although he knew lead poisoning could cause brain damage, he took no action to protect the children. He testified, however, that he did not know children resided with Richardson.

Despite his knowledge of the effects of lead poisoning, and the statutory requirements discussed in Section *VIII.*, *infra*, neither Chodak nor Weinrich warned Richardson about the dangers of lead-based paint, and most important, about peeling, loose lead-based paint. Moreover, before assuming management of the premises, and afterward, Chodak testified that he did not inspect the property to assess the presence of lead-based paint. In January 1986, Richardson informed Chodak that there was "paint and plaster peeling from walls," but even then, he failed to warn her that peeling lead-based paint is readily accessible to children, and therefore, dangerous. In September 1986, a health inspector with the Lead Paint Poisoning Prevention Program notified Chodak of forty-two instances of lead paint violations at the Building, six of which constituted peeling paint. He testified that he had no reason to doubt that those violations were present as early as January 1986.

The evidence tending to establish a breach of duty, when viewed in the light most favorable to Brunson, was legally sufficient for submission to the jury. *See* Rule 2–519(b); *Pahanish*, 69 Md.App. at 353, 517 A.2d 1122. Chodak received notice of lead nuisance violations at other rental properties on four separate occasions and had been a housing inspector in Baltimore City—he clearly knew of the dangers associated with lead poisoning, and in particular, peeling lead-based paint; Richardson complained of peeling paint and regularly asked Appellants for paint; Chodak was aware of the likelihood of peeling lead-based paint within Richardson's home. Thus, and in light of the higher degree of care owed to children, we hold that the evidence was sufficient for the jury to deliberate on the issue of whether Appellants had notice of a defective condition. This standard applies here even though Appellants claim they were unaware children resided in the Building.

Further, Appellants suggest that not only did they not have notice, but they also had no opportunity to correct the condition. The children's injuries were not discovered until August 1986 and Richardson complained about peeling paint in January 1986. Appellants had considerable time to ameliorate the condition.

■ Additionally, the evidence was sufficient for the jury to consider the issue of the children's injuries. *Id.* Two experts, Doctors Chisolm and Hurwitz, provided critical testimony. Dr. Chisolm, an expert in the diagnosis and treatment of children exposed to lead poisoning, testified that lead can be found in approximately eighty-five percent of the older houses in Baltimore City, and that it poses a significant threat to the safety of children. He testified that young children, who naturally engage in hand-to-mouth activity, put "lead dust" or "lead chips" in their mouths, which results in "low level lead poisoning." Children are attracted to lead-based paint, according to Dr. Chisolm, because it tastes sweet. Once the lead is ingested into the digestive system, it disperses throughout the body—attaching to bone, the central nervous system, and the brain. Of the fifty percent absorbed in a child's brain, twenty-five percent remains indefinitely. Tragically, the age a child tends to ingest lead, usually one to three years, is the period of the brain's most rapid development. Dr. Chisolm further testified that "the only affects [sic] of lead that are known are toxic affects [sic]." Although a child exposed to lead poison initially shows no symptoms, the "main affect [sic] of [lead poisoning] is learning disability."

He further explained that studies indicate that a child who has ingested lead will suffer an average loss of four IQ points for every increment of ten micrograms per deciliter of blood lead above the threshold of ten. This occurs regardless of whether the child suffered other obvious ailments—for example, being hit on the head or gross prematurity at birth. He further gave the opinion that a child whose average blood lead was thirty micrograms per deciliter during one to three years

of age suffers an IQ loss of approximately fifteen points at four years of age due at least, in part, to lead poisoning.

Dr. Chisolm testified that Jamall's highest blood lead level was fifty-nine micrograms per deciliter. He explained that the level put the potential for injury to Jamall's health in the "high risk category." Consequently, Jamall was immediately hospitalized and was given chelation therapy (drugs used to increase the excretion of lead from the child's system). Based on the available data and statistics, Dr. Chisolm testified that Jamall "probably had lost eight to ten [IQ] points." He added, however, that, considering the mother was a diabetic and an alcoholic, Jamall lost "six to eight [IQ] points as a result of the ingestion of lead."

Jamika's blood lead level reading was thirty-six micrograms per deciliter, "significantly below" her younger brother's level. Jamika was about two and a half years of age at the time it was discovered that she ingested the lead. The expert concluded that her level was less because she had less hand-to-mouth activity than Jamall. Even so, Dr. Chisolm determined that she suffered a loss of four to six IQ points. To the extent the children's IQ subsequently increased, Dr. Chisolm replied, "I'd still have to say that [absent the lead] they would have been a little smarter."

Dr. Hurwitz testified that both Jamall and Jamika sustained brain damage. He explained that Jamall suffered from "bilateral frontal and prefrontal damage" that was most severe "in the left hemisphere with subcortical involvement." Simply put, Jamall sustained injury in the area of the brain that controls memory and impulsive body movement. When tested, Jamall was unable to control his body from extraneous movements and activities. This is known as "response overflow"—for example, the brain tells the right hand to engage in certain action and the left hand moves uncontrollably.

He opined that Jamika suffered damage to the same areas of the brain as Jamall. According to Dr. Hurwitz, Jamika demonstrated an inability to refrain from talking—which is also an indication of damage to the left side of the brain. She

also demonstrated "response overflow;" her hand movements were slow and uncoordinated. Jamika showed signs of poor balance, and had difficulty writing. With respect to both children, he posited that they could still have sustained brain damage even though they performed well in school. He explained that the brain of a young child is still developing. As the children become older—beginning around third and fourth grade when the children grow beyond rudimentary activities—more complex uses of the brain become necessary, such as comprehension, reading, and writing. Thus, the children's "problems are going to come later on, and people are going to want to know why is this child who has this good level of intelligence having so much trouble in school."

The evidence was sufficient to be submitted to the jury. Even if the children's IQ's increased after their being exposed to lead poisoning, both experts testified that each child suffered brain damage. Dr. Chisolm opined that, to a reasonable degree of medical probability, each child suffered harm to the brain as a result of being exposed to lead. Dr. Hurwitz established that the children sustained injury to the brain and, though they performed well in school at the present time, the complication would arise as the children grow older. The court properly denied defense counsels' motions for judgment.

## VIII.

■ Appellants next contend that the court committed reversible error when it refused to instruct the jury on contributory negligence and superseding causation. They argue that the fact that Richardson "requested [that the landlord supply her with] paint on numerous occasions," and that she "fail[ed] to apply the paint or apply it in a reasonable fashion and fail[ed] to adequately supervise her children because of her drinking[,]" was sufficient evidence to generate an instruction on contributory negligence. Appellants contend that, since they were "*lead* [sic] by the mother to believe that she was keeping the premises painted with the paint Landlord was supplying, any injury sustained by the children was proxi-

mately caused by the mother's intervening and superseding negligence." We disagree.

In *Wegad v. Howard Street Jewelers, Inc.,* 326 Md. 409, 414, 605 A.2d 123 (1992), the Court stated that a "'litigant is entitled to have his theory of the case presented to the jury . . . .' This 'entitlement,' however, is conditioned upon two requirements: '(1) the [requested] instruction must correctly state the law, and (2) that law must be applicable in light of the evidence before the jury.'" (*quoting Sergeant Co. v. Pickett,* 285 Md. 186, 194, 401 A.2d 651 (1979)) (alteration in original).

"'The law contemplates that every person having the capacity to exercise ordinary and reasonable care for his own protection against injury, will do so; it is when he fails to use such care that he is guilty of contributory negligence." *Menish v. Polinger Co.,* 277 Md. 553, 558–59, 356 A.2d 233 (1976). Contributory negligence is defined as

> "conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause co-operating with the negligence of the defendant in bringing about the plaintiff's harm."
>
> In measuring contributory negligence, the standard of care to be used as the criterion is that of an ordinarily prudent person under the same or similar circumstances, not that of a very cautious person. . . . [W]hat an ordinarily prudent and careful person would do under a given set of circumstances is usually controlled by the instinctive urge of one to protect himself from harm.

*Id.* at 559, 356 A.2d 233 (*quoting Craig v. Greenbelt Consumer Servs., Inc.,* 244 Md. 95, 97, 222 A.2d 836 (1966)) (citations omitted).

Section 10–910 of the Annotated Code of Maryland, Courts and Judicial Proceedings Article (1989), provides:

> In an action on behalf of an infant to recover for . . . personal injury, . . . the negligence of the parent or custodian of the infant may not be imputed to the infant.

Accordingly, although the statute does not relieve a parent from all supervision of a child of tender years, "it is only in the somewhat *extraordinary* situation where the parent's negligence is such as to constitute an independent and superseding cause of the child's injuries, that the dormant negligent act of another is discharged." *Caroline v. Reicher*, 269 Md. 125, 130, 304 A.2d 831 (1973) (emphasis added).

The court properly refused Appellants' requests for a contributory negligence and supervening cause jury instruction. Richardson's actions did not give rise to an "extraordinary situation" thereby constituting an "independent and superseding cause of the child's injuries." *Caroline*, 269 Md. at 130, 304 A.2d 831. Appellants were obligated to keep the interior and exterior surfaces of the premises free from loose and defective materials, including lead-based paint. Even if Richardson agreed, as shown in her rental agreement, to "do all inside painting," that fact did not discharge Appellants of their duty to ensure that the premises were in compliance with the Code.

On three occasions, Richardson asked Appellants to supply her with paint, and they apparently complied with the request. On one occasion, she complained to Chodak that paint and plaster were peeling from the walls. Contrary to Appellants' false assertion, the record is devoid of any evidence that Richardson did, in fact, paint the premises. Thus, there is no evidence of the condition of the premises after Appellants supplied the paint. Further, the record lacks any indication that Richardson was aware of the dangers of lead paint, and specifically, that Richardson knew to remove the peeling, loose lead-based paint from the surface before applying a fresh coat of paint. In any event, the fact that she complained to Appellants about the peeling paint, and requested the paint in order to correct the condition, tends to establish that Richardson exercised reasonable, ordinary care—as opposed to showing indifference to a potentially hazardous situation within her dwelling. *See Caroline*, 269 Md. at 136, 304 A.2d 831. "[B]ecause there was insufficient evidence tending to establish the

independent and superseding negligence of the mother, the instruction" was correctly refused. *Id.*

## *IX.*

Finally, Appellants contend that, because of the alleged errors, *supra,* the court abused its discretion when it refused to grant a new trial. Since we affirmed the court's action, *supra,* we hold that the court did not err when it refused to grant counsel's motion for a new trial. *Cf. Buck v. Cam's Broadloom Rugs, Inc.,* 328 Md. 51, 62, 612 A.2d 1294 (1992) (trial court did not abuse its discretion where plaintiff moved for a new trial on the ground that the verdict was against the weight of the evidence and improper remarks by defense counsel in closing argument prejudiced plaintiff).

## *Cross–Appeal*

■ Brunson complains that the court erred when it granted Appellants' motions for judgment as to counts V and VI, wherein she alleged that Appellants violated the Consumer Protection Act. Brunson claims that Appellants' "unfair trade practice of renting a home with poisonous, peeling lead-based paint was the proximate cause of the infant tenants' permanent brain damage." Brunson asserts that, under *Golt v. Phillips,* 308 Md. 1, 517 A.2d 328 (1986), she was entitled to damages for Appellants' deceptive practices, and accordingly, asks this Court to reverse the court's dismissal and remand the case for an assessment of attorneys fees afforded counsel under the Act.

The Act, Annotated Code of Maryland, Commercial Law Article, §§ 13–101 to –501 (1990 & Supp.1992), "specifically prohibits any person from engaging in unfair and deceptive procedures in the rental or offer for rental of consumer realty." *Golt,* 308 Md. at 8, 517 A.2d 328 (*citing* Md.Com. Law II Code Ann. § 13–303(1) and (2) (1983)). Section 13–301 contains a listing of what constitutes an unfair or deceptive trade practice. They include, *inter alia,* any

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or *other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;*

(2) Representation that:

(i) Consumer ... realty ... [has] a sponsorship, approval, accessory, *characteristic, ingredient, use, benefit,* or quantity which [it does] not have;

\* \* \* \* \* \*

(iv) Consumer ... realty ... [is] of a particular *standard, quality,* grade, style, or model which [it is] not;

(3) *Failure to state a material fact* if the failure deceives or tends to deceive....

Md.Com.Law II Code Ann. § 13–301(1)–(3) (1990) (emphasis added).

Section 13–302 provides:

Any practice prohibited by this title is a violation of this title, *whether or not any consumer in fact has been misled, deceived, or damaged* as a result of that practice.

*Id.* § 13–302 (emphasis added). Section 13–408 authorizes damages for actions brought under this title:

(a) *Actions authorized.*—In addition to any action by the Division [of Consumer Protection] or Attorney General authorized by this title and any other action otherwise authorized by law, any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title.

(b) *Attorney's fees.*—Any person who brings an action to recover for injury or loss under this section and who is awarded damages may also seek, and the court may award, reasonable attorney's fees.

*Id.* § 13–408.

Based on the charge to the jury and the jury's verdict, the jury found that Appellants rented an apartment to Richardson in violation of the Baltimore City Code §§ 702 and 703(2)(c), and the City's Public Local Laws § 9–14.1, which collectively prohibit landlords from renting property not otherwise in good repair and fit for human habitation, including being free from loose, peeling lead-based paint. As we discussed in Section *VII., supra,* the jury was presented with sufficient evidence to conclude reasonably that Appellants failed to inform Richardson of the danger of peeling lead-based paint, and consequent-

ly, failed to disclose the actual condition of the premises. Indeed, not only did they fail to disclose that peeling lead-based paint is hazardous, particularly to children, they endeavored to foist upon Richardson the responsibility of painting the premises and curing their violations without subsequently ensuring the Building's safety and habitability. Their failure to give notice to Richardson of the likely dangers of peeling lead-based paint was a proximate cause of the children's brain damage.

In *Golt, supra*, the landlord of a multiple dwelling unit did not have the requisite license or inspection by the housing authorities to rent the premises. 308 Md. at 5, 517 A.2d 328. The landlord argued that the tenants inspected the dwelling before renting, and therefore, the landlord could not have violated the Act. The Court stated, "Implicit in any advertisement and rental of an apartment is the representation that the leasing of the apartment is lawful." *Id.* at 9, 517 A.2d 328. To the extent the landlord violated the Baltimore City Code, Art. 13 § 1101 (1983), which prohibits the operation of any multiple family dwelling without a license, the Court further determined that the landlord's "advertisement and rental of the apartment was a 'misleading ... statement ... or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers.'" *Id.* (*quoting* Md.Com.Law II Code Ann. § 13–301(1) (1983)). The Court found that, since the "meaning of any statement or representation is determined not only by what is explicitly stated, but also by what is reasonably implied," leasing the unlicensed dwelling violated § 13–301(2). *Id.* The landlord also violated § 13–301(3) because the "lack of proper licensing is a material fact that [the landlord] failed to state." *Id.* at 10, 517 A.2d 328. The Court made clear that an "omission is considered material if a significant number of unsophisticated consumers would attach importance to the information in determining a choice of action." *Id.*

Appellants argue that, because Richardson "[was] in a position of superior knowledge of the condition of the premises" being that she had "exclusive possession of the premises," and that after she requested paint and "mislead [sic] [Appellants]

to believe that the painting in the premises was being taken care of," they were not in violation of the Act. They claim that "[n]othing in Maryland law supports [Brunson's] contention that the mere rental of the premises constituted a representation that the premises were in good condition and in compliance with local ordinances." They suggest that they had no knowledge of the existence of peeling lead-based paint, and thus, could not inform Richardson of its inherent dangers. We disagree.

The City ordinances required that Appellants protect Richardson from the hazards of peeling lead-based paint. Neither Richardson nor the children were on notice that the peeling paint contained lead. *Cf. id.* at 11 ("Simply viewing an apartment cannot inform a prospective tenant that the premises are unlicensed. Therefore, at the time [the tenant] signed the lease, he cannot be said to have had knowledge that the premises was not licensed."). Certainly, a significant number of unsophisticated consumers would attach importance to the presence of peeling lead-based paint in a rental dwelling and to the fact that lead-based paint is poisonous, and accessible to young children, especially if loose. *Id.* at 10. Consumers, if armed with that knowledge, can make an informed decision whether to rent the unit, or, as in this case, continue to rent the unit. Thus, Appellants' failure to inform Richardson of the condition tended to mislead Richardson to believe that the Building was free of peeling lead-based paint and therefore habitable.

We hold that the jury, had it been given the opportunity, could have found that Appellants, by renting premises unfit for human habitation in that it contained loose lead-based paint, engaged in an unfair and deceptive trade practice in violation of § 13–301 of the Act. Thus, the court erred when it granted Appellants' motions for judgment as to counts V

**362**

and VI. Accordingly, we vacate the court's order and remand the case for a new trial on counts V and VI.

**JUDGMENT AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED IN ACCORDANCE WITH THIS OPINION; COSTS TO BE PAID BY APPELLANTS.**