533 A.2d 1350

**NEW SUMMIT ASSOCIATES LIMITED PARTNERSHIP et al.**

v.

**Sylvia NISTLE.**

No. 466, Sept. Term, 1987.

Court of Special Appeals of Maryland.

Dec. 7, 1987.

Paul A. Kaplan (Marc R. Engel and David & Hagner, on the brief), Washington, D.C., for appellants.

James J. Debelius (Anne C. Debelius and Debelius, Clifford & Debelius, on the brief), Gaithersburg, for appellee.

Argued before ALPERT, KARWACKI and POLLITT, JJ.

KARWACKI, Judge.

Sylvia Nistle, the appellee, brought suit in the Circuit Court for Montgomery County for compensatory and punitive damages against her former landlord, appellant New Summit Associates Limited Partnership, and its agent, appellant Dreyfuss Brothers, Inc. In counts one and two of her complaint, appellee alleged that New Summit breached express and implied covenants of quiet enjoyment contained in her lease by permitting an invasion of her privacy in the course of a renovation of an apartment adjacent to the apartment she had leased. Counts three, four, and five of her complaint alleged that the same omission constituted negligence, invasion of privacy, and intentional infliction of emotional distress on the part of both New Summit and Dreyfuss Brothers. A jury returned verdicts against the appellants on each cause of action except intentional infliction of emotional distress, awarded appellee $20,000 in compensatory damages, and assessed a $90,000 punitive damage award against New Summit and a $60,000 punitive damage award against Dreyfuss Brothers. Judge L. Leonard Ruben denied appellants' motion for judgment notwithstanding the verdicts, and New Summit and Dreyfuss

Brothers have appealed from the judgments entered against them on those verdicts, contending:

I. The trial court erred by submitting appellee's invasion of privacy claim to the jury because appellee neither alleged nor proved that appellants themselves committed such wrongful conduct.

II. There was insufficient evidence of negligence to warrant submission of appellee's negligence claim to the jury.[1]

III. The trial court erred by permitting appellee to read Article 27, § 580 of the Maryland Code to the jury because appellee never contended, nor did she prove, that appellants violated that criminal statute.

IV. The trial court erred by submitting appellee's claim for punitive damages to the jury.

Viewing the evidence below in a light most favorable to the appellee, as we must in reviewing the denial of a motion for judgment notwithstanding the verdict pursuant to Rule 2–532, *Impala Platinum v. Impala Sales,* 283 Md. 296, 327, 389 A.2d 887 (1978); *Hamilton v. Ford Motor Credit Co.,* 66 Md.App. 46, 59, 502 A.2d 1057 (1986), we conclude that the following facts were proven at trial. On October 12, 1984, appellee, a 25 year old divorcee, moved into an apartment in the New Summit Apartment complex located in Rockville. The apartment complex was owned by New Summit Associates Limited Partnership and managed by Dreyfuss Brothers, Inc. Throughout 1984, various apartments within the complex were renovated after tenants vacated them. The general contractor for the rehabilitation project was the Artery Organization, Inc., an entity affiliated with New Summit. In the course of the renovation process, a rash of thefts and vandalism had occurred in the

---

1. New Summit maintains that the arguments that it presents in support of its second contention also require a reversal of the judgment entered against it on appellee's breach of contract claims. Our disposition of appellants' second contention renders a decision concerning appellee's breach of contract claims unnecessary.

vacant apartments undergoing renovation. Despite these incidents, lock cylinders on the front doors of apartments undergoing renovation were often removed in the first week of work and not replaced, and the apartments were not otherwise secured from unauthorized entry.

Each floor of an apartment building in the New Summit complex contained four individual apartments. The bathroom in appellee's apartment shared a common partition wall with the bathroom of an adjacent apartment on her floor. A large space existed in that partition wall, but bathroom mirrors in each apartment covered the space.

Shortly after appellee moved in, renovation commenced in the apartment contiguous with appellee's apartment. In the first week of the renovation, workers removed the mirror from that apartment's bathroom wall, thereby exposing the rear of appellee's bathroom mirror. Construction work in the apartment commenced each morning between 6:00 and 6:30 a.m., approximately the time at which appellee utilized her bathroom in preparation for work.

On November 13, 1984, appellee discovered two circular marks scratched on her bathroom mirror. She attempted to clean the marks from the mirror, but was unsuccessful. One week later, she reported the existence of the scratches to the management office and was told that someone would look into the matter. At the time, appellee was unaware that the back of her bathroom mirror was exposed to anyone within the adjacent apartment which was undergoing renovation.

On Sunday, December 2, 1984, Mr. Bowman, her upstairs neighbor, told Ms. Nistle that he had recently been inside the vacant apartment which adjoined hers, where he discovered that it was possible to see most of the interior of her bathroom through two holes that had been scratched in the rear of her bathroom mirror. The holes were approximately four and one-half feet above the floor and had been scratched to accommodate a pair of human eyes. Ms. Nistle immediately entered the unlocked, vacant apartment,

and observed the interior of her bathroom through the scratches.

The realization that her bathroom was thus exposed caused the appellee great anxiety. She reported the matter to the police later that evening. Officer Troiano of the Montgomery County Police Department investigated but took no further action.

Still upset the next morning, appellee telephoned the resident manager, Ms. Karen Geier–Smith, and asked her to look into an invasion of the privacy of her bathroom. She did not mention the scratches on her mirror. Ms. Geier–Smith responded to the call by examining the adjacent apartment. As she apologized to the appellee, Ms. Geier–Smith explained that the management office knew of similar incidents which had taken place in other apartments in the course of the restoration project. She stated, however, that the renovation construction workers were not warned to refrain from scratching mirrors because the management was afraid that such a warning would exacerbate the problem. Instead, Dreyfuss assigned to an employee the task of checking for scratched mirrors and painting the backs of any that he might find.

On November 20, 1984, the date on which appellee complained of the scratches on her mirror, the management office knew of at least two instances in which bathroom mirrors in the complex had been similarly damaged. A groundsman employed by Dreyfuss had discovered scratches on the back of a mirror in an occupied apartment when he inspected the bathroom of an adjacent vacant apartment on October 31, 1984. At that time he reported to Ms. Geier–Smith that he could observe the bathroom in the occupied apartment through the scratches. On November 2, 1984, Joyce Ruzich, another tenant at the complex, had reported on a "new resident correction list" that her bathroom mirror needed to be replaced after she discovered two holes scratched in the back of her mirror. Ms. Ruzich placed masking tape over the scratches on her mirror immediately after she discovered them. These incidents

were discussed at a meeting between management personnel and senior representatives from New Summit, Artery, and Dreyfuss.

The appellee vacated her apartment and moved into her parents' house on December 8, 1984. She experienced nausea, diarrhea, and an inability to sleep for several weeks following her discovery of the probable invasion of the privacy of her bathroom. She eventually was required to undergo psychiatric counseling.

## I. INVASION OF PRIVACY

The appellants maintain that they cannot be found liable for an invasion of appellee's privacy because 1) appellee did not establish that her privacy was, in fact, invaded by anyone; and 2) even if appellee's privacy was invaded, the invasion was produced by acts of unknown third parties. The appellee responds that the identity of the actual "Peeping Tom" is not an essential element of her invasion of privacy claim because appellants condoned and thereby created a situation in which her right to privacy in her bathroom "could be, would be, and was unreasonably and seriously invaded."

█ As Judge Wilner, speaking for this Court, noted in *Pemberton v. Bethlehem Steel Corp.*, 66 Md.App. 133, 161, 502 A.2d 1101 (1986):

> The Court of Appeals held in *Carr v. Watkins*, 227 Md. 578, 177 A.2d 841 (1962), that, in a proper case, Maryland would recognize an action for unwarranted invasion of privacy. In subsequent cases—most recently *Lawrence v. A.S. Abell Co.*, 299 Md. 697, 475 A.2d 448 (1984), and *Hollander v. Lubow*, 277 Md. 47, 351 A.2d 421, *cert. denied*, 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976)—the Court has looked primarily to *Restatement of Torts 2d*, §§ 652A–652E, and to W. Prosser, *The Law of Torts* (3d and 4th eds.), in defining the kind of conduct that it would regard as actionable.

The branch of the tort of invasion of privacy which concerns an intrusion upon an individual's seclusion is defined by the *Restatement (Second) of Torts* § 652B.

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

The gravamen of the tort is the intrusion into a private place or the invasion of a private seclusion that the plaintiff has thrown about his person or affairs. *Pemberton v. Bethlehem Steel Corp., supra,* 66 Md.App. at 163, 502 A.2d 1101. One court has stated that:

> This tort . . . is directed to protecting the integrity and sanctity of physical areas a person would naturally consider private and off limits to uninvited, unwelcome, prying persons.

*Cummings v. Walsh Construction Co.,* 561 F.Supp. 872, 884 (S.D.Ga.1983).

■ Appellee's privacy was undoubtedly invaded by the individual who scratched the peepholes in the back of her mirror. An individual's bathroom is certainly a private place that is carefully concealed from uninvited eyes. To establish an invasion of her privacy, appellee was not required to prove that a *particular* individual *actually observed* her while she used the facilities in her bathroom. The intentional act that exposed that private place intruded upon appellee's seclusion.

■ The appellants cannot, however, be held liable for an invasion of appellee's privacy under the evidence in the instant case because Restatement § 652B requires an *intentional* intrusion upon the seclusion of another. There was no proof that the invasion of appellee's privacy was committed by any agent, servant, or employee of either of the appellants. Absent evidence of such intentional participation in the invasion, there is no basis upon which appellants can be held liable on this theory.

## II. NEGLIGENCE

The appellants next assert that there was insufficient evidence to support a submission of appellee's negligence claim to the jury because there is no special duty imposed upon a landlord to protect his tenants against crimes perpetrated by third parties on the landlord's premises. *Scott v. Watson,* 278 Md. 160, 166, 359 A.2d 548 (1976). Moreover, appellants maintain that the record fails to reflect that their conduct was unreasonable.

■ One duty which adheres to the landlord/tenant relationship is the landlord's duty, in certain instances, to warn the tenant of latent defects which exist in the rented premises. The *Restatement (Second) of Torts* § 358(1) codifies the applicable rule:

Undisclosed Dangerous Conditions Known to Lessor

(1) A lessor of land who conceals or fails to disclose to his lessee any condition, whether natural or artificial, which involves unreasonable risk of physical harm to persons on the land, is subject to liability to the lessee and others upon the land with the consent of the lessee or his sublessee for physical harm caused by the condition after the lessee has taken possession, if

(a) the lessee does not know or have reason to know of the condition or the risk involved, and

(b) the lessor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to expect that the lessee will not discover the condition or realize the risk.

The Court of Appeals has adopted this section of the Restatement. *State, Use of Bohon v. Feldstein,* 207 Md. 20, 29, 113 A.2d 100 (1955); *Miller v. Howard,* 206 Md. 148, 155, 110 A.2d 683 (1955).

■ Furthermore, a plaintiff may recover damages for a negligent act which causes nervous shock that results in some clearly apparent and substantial physical injury, as manifested by an external condition or by symptoms clearly

indicative of a resultant pathological, physiological, or mental state. *Vance v. Vance*, 286 Md. 490, 495–501, 408 A.2d 728 (1979); *Bowman v. Williams*, 164 Md. 397, 404, 165 A. 182 (1933); *McCance v. Lindau*, 63 Md.App. 504, 513, 492 A.2d 1352 (1985). For purposes of this rule, the term "physical" denotes merely that the injury for which recovery is sought is capable of objective determination. *Vance v. Vance, supra*, 286 Md. at 500, 408 A.2d 728. The cases recognize that "[t]he nerves and nerve centres of the body are a part of the physical system," *Green v. Shoemaker*, 111 Md. 69, 79, 73 A. 688 (1909) [quoting *Sloane v. Southern Cal. R.R.*, 111 Cal. 668, 44 P. 320 (1896)], and do not deny recovery merely because a plaintiff's damages do not include other, more visible injuries. Thus, the "physical harm" contemplated by the *Restatement (Second) of Torts* § 358 may therefore, in a proper case, include nervous shock or suffering.

■ The peepholes in appellee's bathroom mirror constituted a latent defect in the apartment she rented. This artificial condition on the premises involved an unreasonable risk of physical harm to the appellee which appellants should have realized would not be apparent to appellee. The severe emotional shock that appellee experienced when she discovered the holes was an entirely foreseeable consequence of the latent defect in the premises. The evidence was sufficient to establish that appellants knew, or should have known, that the "scratches" that appellee reported to the management office on November 20, 1984, were, in fact, peepholes into her bathroom. Similar incidents had been reported to the management office in the course of the rehabilitation project, but appellants did nothing more than order an employee to paint the backs of defaced mirrors as they became known. The appellants owed a duty to disclose to the appellee the defective condition of her premises after they became aware of it, and are therefore liable for the injuries that proximately follow from the breach of their duty. Appellee's nervous shock, resulting in nausea, diarrhea, and an inability to sleep, was therefore a compensable

injury caused by appellants' negligence. Consequently, we hold that the appellee's negligence claim was properly submitted to the jury.

## III. ARTICLE 27, § 580 OF THE MARYLAND CODE

Before concluding appellee's case, her counsel was permitted to read to the jury Md.Code (1982 Repl.Vol.), Art. 27, § 580, which states:

> **Trespass in order to look into windows, etc.**
>
> Any person who shall enter upon the land or premises of another for the purpose of invading the privacy of the occupants of any building or enclosure located thereon, by looking into any window, door or other aperture of such building or enclosure, shall be guilty of a misdemeanor and upon conviction thereof shall be fined not more than fifty dollars or imprisoned for not more than thirty days, or both fined and imprisoned.

Appellants assert that no evidence was introduced to establish that this statute was violated and its recitation to the jury was therefore prejudicial error. Moreover, appellants assert that, even if it is assumed that one of the construction workers looked through the scratches in the rear of appellee's mirror, the statute was not violated because the "Peeping Tom" was not a trespasser, but was instead present in the vacant apartment with the permission of the owner. We disagree.

■ Appellant's argument overlooks the fact that the individual who scratched the holes into the rear of appellee's mirror entered upon *appellee's* premises for the purpose of invading her privacy. The bathroom mirror was a part of appellee's leasehold, and the hand that defaced it purposefully entered upon her premises to invade her privacy. The trespasser scratched the rear of the mirror until appellee's bathroom was plainly visible through the aperture thus created, and thereby violated the "Peeping Tom" statute.

The fact that this criminal statute had been violated was relevant to the issue of the reasonableness of appellant's failure to disclose the latent defect in appellee's apartment. The risk of harm associated with the defect—and appellant's concomitant failure to disclose the defect—appear even more unreasonable in light of the fact that the conduct that invaded appellee's privacy also violated a provision of the criminal code.

## IV. PUNITIVE DAMAGES

Appellants maintain that, because appellee's negligence claim arises out of the contractual landlord/tenant relationship between New Summit and the appellee, an award of punitive damages in the instant case must be predicated upon a finding of actual malice on the part of the appellants. Such a finding, they continue, is not supported by the evidence. Appellee argues that she was merely required to prove implied malice to support her award for punitive damages because she had no contractual relationship with Dreyfuss, and her cause of action bears only a "collateral relationship" to her lease with New Summit.

In *H & R Block, Inc. v. Testerman*, 275 Md. 36, 338 A.2d 48 (1975), the Court of Appeals held that actual malice is a prerequisite to the recovery of punitive damages where the tort is one which arises out of a contractual relationship. The Court characterized actual malice as "the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *Id.* at 43, 338 A.2d 48. In a succession of subsequent cases, the Court has outlined the contours of the *Testerman* holding. Before a tort can be characterized as arising out of a contractual relationship, the contractual relationship must first preexist the tortious conduct. *Wedeman v. City Chevrolet Co.*, 278 Md. 524, 529, 366 A.2d 7 (1976). Also present in a "tort arising out of a contractual relationship" is a direct nexus between the tortious act and the performance or breach of the terms and conditions of the parties' under-

lying contract, such that the tortious conduct and the contract are so intertwined that one cannot be viewed in isolation from the other. *General Motors Corp. v. Piskor,* 281 Md. 627, 640, 381 A.2d 16 (1977). Most recently, the Court has stated that:

> Perhaps the clearest applications of the *Testerman* principle occur when the plaintiff and the tortfeasor are in privity and the conduct of the tortfeasor may properly be pleaded alternatively (whether or not actually pleaded), as a breach of contract and as a tort.

*Miller Building Supply, Inc. v. Rosen,* 305 Md. 341, 349, 503 A.2d 1344 (1986).

 Appellee's negligence claim against New Summit meets all the requirements of a tort arising out of a contractual relationship. The contractual landlord/tenant relationship between the parties was established prior to appellant's negligent omission. Appellants' tortious conduct was inextricably connected with New Summit's lease to the appellee because New Summit's duty to inform appellee of latent defects in the rented premises would not have existed "but for" the landlord/tenant relationship created by the lease. As landlord and tenant, the parties were in privity with one another. Finally, appellee properly pleaded her cause of action against New Summit as a tort (negligence) and, in the alternative, as a breach of contract (breach of the covenant of quiet enjoyment). Appellee's negligence claim against New Summit arose from her contractual relationship with New Summit, and she was not entitled to an award of punitive damages without demonstrating actual malice.

 Appellee was similarly required to prove actual malice before she could recover punitive damages from Dreyfuss Brothers because her negligence claim against Dreyfuss arose out of her contract with New Summit. In order for a tort to arise out of a contract, both parties to the tort action need not be parties to the contract. *R.E. Linder Steel Erection Co., Inc. v. Wedemeyer, Cernik, Corrubia,*

*Inc.*, 585 F.Supp. 1530, 1533 (D.Md.1984) *citing Knicker-bocker Ice Co. v. Gardiner Dairy Co.*, 107 Md. 556, 69 A. 405 (1908). As the agent of the landlord, New Summit, Dreyfuss was liable to the appellee for its failure to warn her of the latent defect in her leasehold only because it failed to perform a duty which was created by the contractual relationship established by the lease. This duty would not have existed "but for" the lease. Her negligence claim against Dreyfuss therefore arose out of a contract.

■■■■■ The record does not support the conclusion that appellants acted with an evil or rancorous motive to deliberately and willfully injure the appellee. Although appellants negligently failed to apprise the appellee of the existence of the defect in her leasehold, their omission does not evidence a rancorous motive or a deliberate desire to cause appellee injury. In her brief, the appellee maintains that "[t]he evidence gave rise to a reasonable and most probable inference that the motivation for appellants' conduct was to maximize income and minimize expenses at the known risk of invasion of tenants' privacy." A mere desire to realize commercial gain at the expense of another does not, without more, reach the requisite mental state for actual malice. *H & R Block, Inc. v. Testerman, supra*, 275 Md. at 47, 338 A.2d 48; *St. Paul at Chase Corp. v. Manufacturers Life Ins. Co.*, 262 Md. 192, 238–39, 278 A.2d 12 (1971); *Knickerbocker Ice Co. v. Gardiner Dairy Co., supra*, 107 Md. 569–70, 69 A. 405.

■■■■ Furthermore, the evidence produced at trial does not support an award of punitive damages even under an implied malice standard. In those cases in which an award of punitive damages is allowed absent a showing of actual malice, the plaintiff must demonstrate, on the part of the defendant, "such extraordinary or outrageous conduct as to amount to the possible legal equivalent of actual intent or actual malice; also described as the wanton, reckless disregard for the rights of others." *Medina v. Meilhammer*, 62 Md.App. 239, 248–49, 489 A.2d 35 (1985). Mere thought-

lessness, inadvertence, or simple inattention do not amount to the aggravated form of negligence from which malice can be implied. *Cambridge Iron & Metal Co. v. Hartman,* 65 Md.App. 629, 637, 501 A.2d 877 (1985); *Medina v. Meilhammer, supra,* 62 Md.App. at 251, 489 A.2d 35. Appellants negligently failed to inform appellee of the latent, defective condition of her leasehold, but the record does not support a conclusion that this omission constituted anything more than a negligent inattention to the problems reported by New Summit's tenants. Consequently, we shall reverse that portion of the judgment awarding the appellee punitive damages.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART.

COSTS TO BE DIVIDED ONE-EIGHTH TO APPELLANTS, SEVEN-EIGHTHS TO APPELLEE.