645 A.2d 1147

**RICHWIND JOINT VENTURE 4 et al.**

v.

**Ernestine BRUNSON et al.**

**No. 120, Sept. Term, 1993.**

Court of Appeals of Maryland.

Aug. 22, 1994.

664

Denise Ramsburg Stanley (Donald C. Allen, Allen, Johnson, Alexander & Karp, all on brief) Baltimore, for petitioner.

C. Christopher Brown (Joseph B. Espo, Brown, Goldstein, & Levy, all on brief) Baltimore, for respondent.

H. Thomas Howell, David A. Carter, Howell, Gately, Whitney & Carter, all on brief, Towson, amicus curiae, for the American Ins. Ass'n.

H. Thomas Howell, Daniel W. Whitney, Wendy A. Lassen, Howell, Gately, Whitney & Carter, all on brief, Towson, amicus curiae, for Continental Realty Corp.

M. Albert Figinski, Julie C. Janofsky, David W. Erb, Weinberg and Green, all on brief, Baltimore, amicus curiae, for The Apartment Builders and Owners Council of the Home Builders Ass'n.

Sally B. Gold, Gwen B. Tromley, Law Offices of Sally B. Gold, all on brief, Baltimore, amicus curiae, for Housing Authority of Baltimore City.

James E. Gray, Jeanne B. Gardner, Joseph E. Dever, Goodell, DeVries, Leech & Gray, Baltimore, amicus curiae, of the Property Owners Ass'n of Greater Baltimore, Inc.

Argued Before MURPHY, C.J., and RODOWSKY, CHASANOW, KARWACKI, BELL, RAKER and CHARLES E. ORTH, Jr.* (retired), Specially Assigned, JJ.

CHASANOW, Judge.

Before this Court are a number of related cases involving the tragic circumstances of children suffering from various injuries due to their consumption of lead-based paint. The petition for certiorari was granted in the instant case in order to address the following issues:

1. To what extent, if any, do the lead-based paint provisions of Baltimore City ordinances and Public Local Laws supersede the common law requirement that a landlord's liability for negligence depends upon notice of a particular defect and a reasonable opportunity to correct it?

2. To what extent, if any, does the Maryland Consumer Protection Act impose strict liability for personal injury upon a landlord without requiring proof of knowledge, deception, reliance, or causation?

---

* Orth, J., participated in the hearing of the case, but died prior to the decision and adoption of this opinion.

For the reasons discussed herein, we affirm the Court of Special Appeals as to the jury's verdict regarding negligence, but reverse the intermediate appellate court's holding with respect to Maryland's Consumer Protection Act. *See Richwind v. Brunson,* 96 Md.App. 330, 625 A.2d 326 (1993). *See also* Maryland Code (1975, 1990 Repl.Vol.), Commercial Law Article, §§ 13-101 through 13-501.

## I. Facts

In December of 1983, Barbara Richardson moved into a residential rental property located at 2119 West Fairmount Avenue in Baltimore City and owned by Harry and Rita Baitch. While residing at the property, Ms. Richardson gave birth to her daughter Jamika Holman on March 18, 1984, and to her son Jamall Holman on March 13, 1985. In December 1985, Richwind Joint Venture (a general partnership) purchased the premises from Mr. and Mrs. Baitch. At the time Richwind assumed ownership, Barbara Richardson was already in possession of the premises under a preexisting lease.

Shortly thereafter, Richwind hired Scoken Management Corporation to manage the property and collect rent payments from the tenant. At that time, Scoken managed approximately 400 residential real estate properties, most of which were located in Baltimore City. Mark Chodak was the president of Scoken Management Corporation. Scoken's services were retained because of Richwind's prior business dealings with Mr. Chodak. Chodak had been a property manager for approximately sixteen years, prior to which he was a housing inspector for Baltimore City for two years. Chodak also attended and graduated from law school.

Scoken assumed the management of 2119 West Fairmount Avenue in January of 1986. At that time, Chodak knew that homes built prior to 1957 "often" contained lead-based paint, and that the property in question was built before 1957. Chodak also testified, however, that he possessed no specific knowledge that the premises contained lead-based paint at the time Scoken assumed the management of it. Richwind also alleged it did not know of any lead-based paint contained in

the property at the time of its purchase. At the time of the purchase, there were no outstanding or "uncorrected violation notices" regarding the property. Richwind did not inspect the property when it was purchased, nor did it instruct Scoken to do so.

Once Scoken assumed management of the property, it immediately sent a letter apprising the tenant of that fact, and indicating that if she had any complaints regarding the property she should notify Scoken. Beginning on January 15, 1986, Ms. Richardson forwarded a series of complaints to Scoken about the disrepair of the premises. According to Scoken's records, the following complaint was made on January 17, 1986: "[P]aint & plaster peeling from walls." Chodak thereafter dispatched one of Scoken's workmen to correct the problem. Chodak testified that he did not inspect the property himself to determine either the condition of the paint or whether his employee corrected the problem in a satisfactory manner. On the other hand, Chodak also testified that he did visit the property sometime between January and September of 1986, though he could not recall the exact dates. The record further reflects that on at least three separate occasions (January 20, February 5, and April 30, 1986) after Scoken's employee responded to the initial complaint, Ms. Richardson requested paint from Scoken in order to repaint portions of the premises herself. Scoken provided the paint each time Ms. Richardson requested it.

On September 3, 1986, Jamika and Jamall Holman were both evaluated by the Kennedy Institute's Lead Poisoning Prevention Program, and they were determined to have elevated blood-lead levels. Due to Jamall's exceedingly high blood-lead level, he was immediately hospitalized to undergo chelation therapy.[1] Because of these high blood-lead levels, the Baltimore City Health Department inspected the property. On September 22, 1986, the Department served Richwind and Chodak with an "Emergency Violation Notice and Order

---

1. According to expert testimony elicited at trial, chelation therapy is a drug treatment that assists the body in excreting lead.

to Remove Lead Nuisance." The Department's notice enumerated 42 specific lead paint violations of the Baltimore City Code. *See, e.g.,* Baltimore City Code (1983 Repl.Vol.), Article 13.

Barbara Richardson filed a complaint in the Circuit Court for Baltimore City as the mother and next friend of Jamika and Jamall for injuries allegedly sustained by the children as a result of exposure to lead-based paint. Ms. Richardson died while the case was still pending and Ernestine Brunson, the children's grandmother and personal representative of Barbara Richardson's estate, was substituted as the plaintiff. Among others not here relevant, the complaint named the following as defendants: Harry and Rita Baitch (the original owners of the property), Richwind Joint Venture 4 (the current owner) and Scoken Management Corporation (Richwind's management company). As amended, the complaint alleged that the defendants were negligent, created a nuisance, and violated Maryland's Consumer Protection Act ("CPA"). *See* Md.Code (1975, 1990 Repl.Vol.), Comm.Law Art., §§ 13–101 through 13–501.

Rita Baitch settled with the plaintiffs prior to trial.[2] Also, the common law nuisance counts against the remaining defendants were dismissed prior to trial. The case proceeded to trial on the negligence and consumer protection counts, and after the parties presented their cases, the trial judge granted the defendants' motion for judgment on the CPA counts. Subsequently, the jury returned a verdict in favor of the plaintiffs and awarded compensatory damages of $252,000.00 for Jamall Holman and $247,500.00 for Jamika Holman. In addition, the court awarded damages to Richardson's estate in the amount of $18,944.00.

The defendants appealed and the plaintiffs cross-appealed to the Court of Special Appeals which affirmed the jury's negligence finding, reversed the circuit court's dismissal of the

---

**2.** Harry Baitch died prior to settlement and Rita Baitch, as personal representative of Harry's estate, settled on its behalf.

consumer protection counts, and remanded the case. *See Richwind v. Brunson,* 96 Md.App. 330, 625 A.2d 326 (1993). This Court granted the defendants' petition for a writ of certiorari.

## II. Negligence

■ In order to establish a cause of action for negligence, the plaintiffs must prove the following elements: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Rosenblatt v. Exxon,* 335 Md. 58, 76, 642 A.2d 180, 188 (1994) (citing *Faya v. Almaraz,* 329 Md. 435, 448, 620 A.2d 327, 333 (1993) and *Lamb v. Hopkins,* 303 Md. 236, 241, 492 A.2d 1297, 1300 (1985)).

In its brief before this Court, Richwind asserts that a landlord's liability for negligence depends upon actual knowledge of a defective condition on the premises, a contractual duty to repair it and a reasonable opportunity to do so. Even though Richwind concedes that "numerous statutory enactments impact upon the relationship between landlord and tenant," it further contends that "they do not supersede the common law requirement that a landlord's liability for negligence depends upon notice of a particular defect and a reasonable opportunity to correct it."

■ We agree with Richwind's concession that certain statutory enactments impact upon the common law requisites of liability in the instant case. For instance, even if Richwind is not liable for negligence under the common law, absent a covenant to repair, its duty to protect the plaintiffs from injury may nonetheless emanate from specific provisions of the Baltimore City Code. *See* Balt.City Code (1983 Repl.Vol.), Art. 13, §§ 702, 703 and 706. Section 702 of the city code provides that every building in Baltimore City which is occupied as a dwelling is to be "kept in good repair, in safe condition, and fit for human habitation." Section 703(2)(c)

defines one of the standards for good repair as follows: "All walls, ceilings, woodwork, doors and windows shall be kept clean and free of any flaking, loose or peeling paint and paper." Section 706 also states that "[n]o paint shall be used for interior painting of any dwelling ... unless the paint is free from any lead pigment."[3] The implied warranty of habitability established by §§ 702 and 703 necessarily includes flaking, loose or peeling *lead-based* paint within the scope of hazardous conditions that render the premises unfit for human habitation. Thus, a landlord leasing property in Baltimore City is under a statutory obligation to correct such a hazardous condition even in the absence of a contractual duty to do so.

Violation of these city code provisions may be the basis for a negligence action. *See Restatement (Second) of Property, Landlord and Tenant* § 17.6 (1977). Section 17.6 provides as follows:

"A landlord is subject to liability for physical harm caused to the tenant and others upon the leased property with the consent of the tenant or his subtenant by a dangerous condition existing before or arising after the tenant has taken possession, if he has failed to exercise reasonable care to repair the condition and the existence of the condition is in violation of:

(1) an implied warranty of habitability; or

(2) a duty created by statute or administrative regulation."

We agree with § 17.6 of the *Restatement (Second) of Property, Landlord and Tenant.* We therefore conclude that a private cause of action in a landlord/tenant context can arise

---

**3.** Petitioners contend in their brief that section 706 "requires that portions of a dwelling that are normally painted shall be painted and directs the manner in which painting is to be accomplished. *This section expressly prohibits prospective application of lead-based paint.*" (Emphasis added). We agree with this interpretation of § 706, and we note that the plaintiffs do not rest their claims on this section of the city code alone possibly due to the fact that it concerns only the prospective use or application of lead-based paint.

from a violation of any statutory duty or implied warranty created by the Baltimore City Code. If Richwind violated one of the city code provisions, that violation could provide the basis for a negligence action against it and its agent, Scoken Management Corporation.

■ The relevant issues in the instant case are, therefore, whether the city code's notice provisions expand common law liability, and whether Richwind or its agent had adequate notice and/or knowledge of this hazardous lead paint condition. *See* Balt. City Code (1983 Repl.Vol.), Art. 13, §§ 301, 302 and 303. In resolving the issue of whether the city code expands the common law, we first recognize the well-settled principle in Maryland that, in construing a statute, we assume that the statute was not intended to modify, nullify, or supersede the common law of the State absent any clear indication to the contrary. *See Bradshaw v. Prince George's County,* 284 Md. 294, 302, 396 A.2d 255, 260 (1979); *Lutz v. State,* 167 Md. 12, 15, 172 A. 354, 355–56 (1934).

In *Bradshaw v. Prince George's County,* for example, this Court discussed the effect of a county charter upon the common law doctrine of sovereign immunity. The Court stated that "[i]t is presumed that the legislative body did not intend to make any alteration of the common law other than what is plainly stated." 284 Md. at 302, 396 A.2d at 260. Thus, the Court determined that statutory provisions which are "in contravention of the common law of this State ... should be strictly construed." *Id.* In *Lutz v. State,* this Court also stated the following:

"It has been said that statutes are not presumed to make any alterations in the common law further than is expressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not take away the common law. The rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language." (Interior quotation marks and attribution omitted).

167 Md. at 15, 172 A. at 356. *See also Equitable Life Assurance v. Jalowsky,* 306 Md. 257, 263, 508 A.2d 137, 140 (1986); *Hardy v. State,* 301 Md. 124, 131, 482 A.2d 474, 478 (1984). The *Lutz* Court also remarked that a statute which "deals with an entire subject-matter is generally construed as abrogating the common law as to that subject." 167 Md. at 15, 172 A. at 356.

The city code provision in question in the instant case provides as follows:

"Whenever the Commissioner of Housing and Community Development determines that there has been a violation of any provision of this Code or of any rule or regulation adopted pursuant hereto, he shall give notice of such alleged violation to the person or persons responsible therefor as hereinafter provided."

Balt.City Code (1983 Repl.Vol.), Art. 13, § 301. Section 303 of the city code also states that the Commissioner "shall order the necessary corrections by notice and service" as provided therein. Each of these sections therefore provides that the landlord must be served with notice and afforded a reasonable opportunity to correct the defective condition.[4]

■ Analogously, the common law of this State provides that a landlord is not liable for a defective condition on the property unless the landlord either knows or has reason to know of the condition and has a reasonable opportunity to correct it. *See Scott v. Watson,* 278 Md. 160, 169, 359 A.2d 548, 554 (1976); *Ramsey v. D.P.A. Associates,* 265 Md. 319, 322, 289 A.2d 321, 323 (1972); *Katz v. Holsinger,* 264 Md. 307,

---

4. The plaintiffs in the instant case also contend that the landlord violated Baltimore City's Code of Public Local Laws (1980) §§ 9.9 and 9-14.1. Our result remains the same under the local laws because both of these sections specifically provide that a landlord must receive notice. Section 9.9(d)(1), entitled "Rent escrow law," provides that the landlord or his agent must be "notified in writing by Certified Mail" or by "a violation or condemnation notice from an appropriate State or municipal agency." Section 9-14.1(a)(2), entitled "Implied warranty of fitness for human habitation," provides that "no action ... shall be instituted ... unless the landlord has notice of the conditions on the premises which constitute the breach of the warranty of habitability."

311–12, 286 A.2d 115, 118 (1972); *Elmar Gardens, Inc. v. Odell,* 227 Md. 454, 458, 177 A.2d 263, 265–66 (1962); *State v. Feldstein,* 207 Md. 20, 29–34, 113 A.2d 100, 104–06 (1955).[5] *See also Restatement (Second) of Torts* §§ 357 and 358 (1965) (imposing liability only if landlord knows or has reason to know of the existence of a dangerous condition); Sonja Larsen, Annotation, *Landlord's Liability for Injury or Death of Tenant's Child from Lead Paint Poisoning,* 19 A.L.R.5th 405, 418–24 (1994) (summarizing lead paint cases founded on negligence claims of which the vast majority that did not concern injuries sustained in "common areas" required some form of notice or knowledge as a prerequisite to imposition of liability on the landlord). As Richwind has contended, "[l]iability for negligence may not be imposed based solely upon the existence of a defective condition that is violative of the statutes, without regard to whether the landlords had notice of the existence of the alleged defective condition and had a reasonable opportunity to correct it."

Thus, the common law and the city code appear consistent with each other as they apply to the prerequisite of knowledge and/or notice. Both require that a landlord have notice of the dangerous condition on the property and a reasonable opportunity to correct it. Neither impose upon Richwind a duty to periodically inspect[6] the premises during the leased period for dangerous conditions to determine if repairs are necessary. To hold otherwise would circumvent years of unbroken precedent concerning such a duty, and might force landlords to become the "insurers" of their ten-

---

**5.** Although these cases discuss a landlord's contractual obligation to correct defective conditions, the duty in the instant case arose out of the statutory obligation imposed by the Baltimore City Code. Thus, we rely on the reasoning of these cases only as it applies to the common law "knowledge" requirements.

**6.** There are some duties to inspect, or to have a property inspected, that are not relevant in the instant case. *See, e.g.,* Baltimore City Code (1983 Repl.Vol.), Article 13, § 1102(c) (providing for inspections by designated authorities prior to the granting of a license to rent a "rooming house" or "multiple family dwelling").

ants, a policy which has been repeatedly rejected by the courts of this State. *See Scott,* 278 Md. at 165, 359 A.2d at 552 (reiterating that "mere ownership of buildings does not render the owner liable for injuries sustained by tenants since the landlord is not an insurer of such persons"); *Ramsey,* 265 Md. at 321, 289 A.2d at 323 (asserting that "the owner is not an insurer of the safety" of those rightfully on the premises); *Elmar Gardens, Inc.,* 227 Md. at 457, 177 A.2d at 265 (stating that "[m]ere ownership of land or buildings does not render the owner liable for injuries sustained by tenants or invitees rightfully on the premises, for the owner is not an insurer of such persons but owes them the duty only to exercise ordinary care").

The primary difference between the city code requirements and the common law is how the landlord obtains actual knowledge of a defective condition on the premises. Under the city code, the Commissioner of Housing and Community Development is obligated to serve the landlord with notice of a violation in order to require the needed repairs. Under the common law, however, it does not appear relevant who provides the landlord with notice of a hazardous condition, as long as the landlord knows or has reason to know of the problem and has an opportunity to correct it. *See McKenzie v. Egge,* 207 Md. 1, 6–7, 113 A.2d 95, 97 (1955) (recognized as the seminal case itemizing general requirements of notice and opportunity-to-correct). Under either theory, however, the notice and knowledge requirements remain the same no matter how the landlord obtains such knowledge.

Thus, we agree with the proposition stated in the Amicus Curiae brief of the Apartment Builders and Owners Council of the Home Builders Association of Maryland:

"Plainly, the landlord's common law right to notice and an opportunity to correct a particular defect is *reinforced,* not superseded, by the provisions of the Baltimore City Code and the Balt.Pub.Local Laws." (Emphasis in original).

As Richwind has also contended, "there is no breach of any duty created by the statutes unless the landlord has notice of

the deficiency and fails to correct it." We hold that the city code does not alter or supersede the common law concerning a landlord's knowledge of a defective condition on the premises.

Section 358 of the *Restatement (Second) of Torts* (entitled "Undisclosed Dangerous Conditions Known to Lessor") summarizes these knowledge requirements as follows:

"(1) A lessor of land who conceals or fails to disclose to his lessee any condition, whether natural or artificial, which involves unreasonable risk of physical harm to persons on the land, is subject to liability to the lessee and others upon the land with the consent of the lessee or his sublessee for physical harm caused by the condition after the lessee has taken possession, if

(a) the lessee does not know or have reason to know of the condition or the risk involved, and

(b) the lessor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to expect that the lessee will not discover the condition or realize the risk."

Comment *b* to § 358 further explains as follows:

"In order for the rule stated in this Section to apply, it is not enough that the dangerous condition of the land is one which might be discovered by a reasonable inspection of the premises. The lessor is under no duty to his lessee, or to any other person entering the land, to make such an inspection, except where premises are leased for a purpose involving the admission of the public, as stated in § 359.

It is not, however, necessary that the vendor have actual knowledge of the condition, or that he be in fact aware that it involves an unreasonable risk of physical harm to persons on the land. It is enough that he has reason to know that the condition exists, as that phrase is defined in § 12(1). . . ."

Finally, this Court has distinguished between "reason to know," which is required by § 358, and "should know," which is utilized in other sections, in the following manner:

" 'Both the expression "reason to know" and "should know" are used with respect to existent facts. These two phrases, however, differ in that "reason to know" implies no duty of knowledge on the part of the actor whereas "should know" implies that the actor owes another the duty of ascertaining the fact in question. "Reason to know" means that the actor has knowledge of facts from which a reasonable man of ordinary intelligence or one of the superior intelligence of the actor would either infer the existence of the fact in question or would regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist. "Should know" indicates that the actor is under a duty to another to use reasonable diligence to ascertain the existence or non-existence of the fact in question and that he would ascertain the existence thereof in the proper performance of that duty.' "

*Feldstein,* 207 Md. at 33, 113 A.2d at 106 (quoting *Restatement of Torts* § 12 cmt. *a* (1934)); *Restatement (Second) of Torts* § 12. *See Landlord's Liability for Injury or Death of Tenant's Child from Lead Paint Poisoning,* 19 A.L.R.5th at 418–24.

■ Knowledge of a condition which involves unreasonable risk of physical harm to persons on the land may not be imputed to a landlord merely from general knowledge that other properties of like age, construction, or design might possibly contain such hazardous conditions. Likewise, a landlord is under no duty to inspect the premises in order to determine whether such conditions exist. *See Restatement (Second) of Torts* § 358 cmt. *b* (stating that a lessor "is under no duty to his lessee ... to make such an inspection"). *See also Kleiman v. Mono of Maryland, Inc.,* 254 Md. 548, 553–55, 255 A.2d 393, 396–97 (1969) (adopting § 357 of the *Restatement (Second) of Torts,* and stating that a landlord is under no duty to inspect the property unless a contract so provides); *Feldstein,* 207 Md. at 33, 113 A.2d at 106; *New Summit Associates v. Nistle,* 73 Md.App. 351, 361, 533 A.2d 1350, 1355 (1987).

Substantially the same issue was recently addressed at some length by the United States District Court for the District of Maryland in *Hayes v. Hambruch,* 841 F.Supp. 706 (D.Md.1994). *Hayes* was before the federal district court on a motion for summary judgment, and it presented somewhat similar facts to those of the instant case. The district court determined that, even though the landlord had "notice of the existence of flaking paint in the leased premises," there was "simply no evidence in the record indicating defendant had 'reason to know' of the existence of *lead* paint in the leased premises." *Hayes,* 841 F.Supp. at 711 (emphasis added).

■ Unlike in the instant case, however, there was no evidence that the landlord in *Hayes* possessed independent knowledge of the existence or dangers of lead-based paint in older homes. The district court recognized that, "in her answers to plaintiffs' interrogatories, defendant has denied that she had any knowledge of the presence of lead paint on the premises or of the alleged hazards of lead paint. . . ." *Id.* Further, the court pointed out the following:

"It is significant in this particular case that the lead poisoning here occurred in the mid–1970s. Defendant contends (and plaintiffs have not disputed the fact) that lead paint poisoning was not a well known problem at that time. Thus, there is no evidence that defendant was unreasonable in not being aware of the potential danger resulting from paint in the leased premises. A different case might be presented if plaintiffs had shown that the potential for lead poisoning was a danger that landlords *in general* should have been aware of at the time of the alleged lead poisoning."

841 F.Supp. at 711 n. 2 (emphasis in original). The instant case occurred approximately a decade later, and the potential for lead poisoning from peeling paint in older buildings was more commonly known. Scoken Management received notice of "paint & plaster peeling from [the] walls" on January 17, 1986. At that time, Scoken's president had approximately sixteen years of experience as a property manager and for two

years he was a Baltimore City housing inspector. He testified that at the time Scoken received the January 17th complaint he was aware that houses built before 1957 often contained lead-based paint. The property at issue in the instant case was concededly built before 1957. The Court of Special Appeals summarized portions of Chodak's testimony as follows:

> "Counsel then solicited testimony from Chodak that he knew in 1986 that older houses, those built before 1957, contained lead-based paint; that the Building is old; and that peeling lead-based paint was dangerous to children."

*Richwind,* 96 Md.App. at 344, 625 A.2d at 333. The intermediate appellate court concluded that a jury could reasonably find from the evidence that "Chodak was aware of the likelihood of peeling lead-based paint within Richardson's home." *Richwind,* 96 Md.App. at 352, 625 A.2d at 337. We agree with the Court of Special Appeals' analysis of the testimony. A jury could reasonably conclude that, based on the complaint of peeling paint, the age of the building, and Chodak's knowledge of the danger of lead paint in older buildings, Scoken Management knew or had reason to know that lead poisoning was a danger.

Richwind contends that "notice of a defect in a particular premises requires more than knowledge that lead paint poses a health risk to children and many older houses contain lead based paint and the house at issue was an older house." We agree that knowledge of the fact that older homes often contain lead-based paint, without the knowledge that the paint in a particular older home is actually peeling or flaking, may be insufficient by itself to hold a landlord liable. Based on the evidence presented, however, the jury in the instant case could have found that Scoken received actual notice of peeling paint on the premises and also, because of Chodak's knowledge about older homes often containing lead-based paint, knew or had reason to know that the peeling paint in this house was lead-based. Upon obtaining that knowledge, the landlords knew the risk peeling lead-based paint represented to the tenant's children. *See Restatement (Second) of Torts*

§ 358(1)(b) (imposing a duty upon a landlord to disclose dangerous conditions if the landlord "knows or has reason to know of the condition, *and realizes or should realize the risk involved,* and has reason to expect that the lessee will not discover the condition or realize the risk" (emphasis added)). *See also Feldstein,* 207 Md. at 29–30, 113 A.2d at 104 and *Miller v. Howard,* 206 Md. 148, 155, 110 A.2d 683, 686 (1955) (both referring to § 358 of *Restatement of Torts* which contains substantially the same language as the *Restatement (Second) of Torts* ); *New Summit Associates,* 73 Md.App. at 361, 533 A.2d at 1355.[7]

---

**7.** We note that the General Assembly recently passed comprehensive legislation which governs the existence and abatement of lead-based paint in residential rental properties. *See* House Bill 760 (1994) (amending the Annotated Code's Environment, Insurance, and Real Property Articles). The stated purpose of this new legislation is as follows:

"For the purpose of establishing the Lead Poisoning Prevention Program in the Department of the Environment; specifying properties subject to this Act; exempting certain properties from this Act; establishing the Lead Paint Poisoning Commission, its duties and membership; establishing a Lead Poisoning Prevention Fund; requiring the Department of the Environment to adopt certain regulations; establishing certain risk reduction standards for affected properties; requiring owners of certain affected properties to register those properties with the Department; requiring owners of certain affected properties to satisfy certain risk reduction standards at certain times; specifying the methods for satisfying the standards; requiring owners of affected properties to provide for certain inspections under certain circumstances; authorizing the Department to provide oversight for lead-contaminated dust testing and inspection and to spot-check compliance; requiring the Department to make certain determinations, and to provide notice of those determinations to owners of certain affected properties; providing for the filing of certain reports to the Department; providing for certification of compliance with certain standards; establishing responsibilities of certain tenants in affected properties; providing for immunity from liability for damages for certain owners of affected properties under certain circumstances; providing for the collection of certain fees; providing for the enforcement of certain provisions of this Act; providing for the imposition of certain penalties; specifying the duties of the Maryland Insurance Administration in enforcing this Act; authorizing the Administration to adopt certain regulations authorizing certain persons, with respect to certain properties, to make certain offers to lead poisoned children under certain circumstances; specifying the responsibilities of certain insurers and certain

The tenant and particularly the children injured by the peeling paint, however, did not know nor have reason to know of the risk that condition presented.[8] The landlord failed to disclose the risk to the tenant and failed to properly remove the hazard even though it had a reasonable opportunity to do so.[9] In light of all the facts, we hold that there was sufficient evidence to present an issue to the jury. *See Katz,* 264 Md. at 310, 312, 286 A.2d at 118 (holding that testimony concerning oral agreement between landlord and tenant was "sufficient to present a jury issue in regard ... to the landlord having sufficient notice of the particular defect and a reason-

---

owners; prohibiting certain landlords from taking certain actions against certain tenants under certain circumstances; providing for the expiration of the initial terms of the voting members of the Commission; providing for a certain study of pooling of certain risks; defining certain terms; repealing the Advisory Council on Lead Poisoning; specifying the application of this Act; and generally relating to the Lead Poisoning Prevention Program."

As House Bill 760 is designated to take effect on October 1, 1994, it is inapplicable to the instant case. *See* H.B. 760 at 65; Heather Durkee, *Lead Paint Law Signed by Governor; Sets Fines, Abatement Timetable,* Daily Record, May 3, 1994, at 5 (acknowledging that Governor William Donald Schaefer signed H.B. 760 into law).

8. We note that, even if Ms. Richardson had possessed such knowledge and was thereby contributorily negligent, that fact would not be relevant because the contributory negligence of a parent is not imputed to the child. Only where such alleged negligence supersedes the defendant's negligence, can it bar recovery. *See Caroline v. Reicher,* 269 Md. 125, 130, 304 A.2d 831, 834 (1973) (concluding, in a lead paint case, that parent's negligence is not imputed to the child, and such will not relieve the landlord of liability unless it is an "independent and superseding cause of the child's injuries"). *See also* Maryland Code (1974, 1989 Repl.Vol.), Courts and Judicial Proceedings Article, § 10–910 (stating that "[i]n an action on behalf of an infant to recover for death, personal injury, or property damage the negligence of the parent or custodian of the infant may not be imputed to the infant").

9. Scoken received the initial complaint from the tenant on January 17, 1986, and an emergency violation notice from the Health Department, which enumerated 42 specific lead paint violations, was issued to the defendants on September 22, 1986. Thus, the jury could rationally have found that the condition persisted for over eight months after Scoken received the initial complaint from the tenant.

able opportunity to repair it"). Therefore, there was sufficient evidence to support the jury's verdict.

## III. Consumer Protection Act

In 1975, the General Assembly enacted substantial portions of Maryland's current Consumer Protection Act (CPA). *See* Chapter 49 of the Acts of 1975 (repealing the prior "Sales and Notices" Article, Md.Code (1957, 1969 Repl.Vol. & 1974 Cum. Supp.), Art. 83). *See also* Md.Code (1975, 1990 Repl.Vol.), Comm.Law Art., § 13–101 through 13–501. The CPA was intended to "set certain minimum statewide standards for the protection of consumers across the State." *Id.* § 13–102(b)(1). In broad language, the CPA prohibits a person from engaging in "any unfair or deceptive trade practice." *Id.* § 13–303. It also authorizes a private cause of action for recovery of damages, and possibly attorney's fees at the discretion of the court. Section 13–408, entitled "Action for damages," provides as follows:

"(a) *Actions authorized.*—In addition to any action by the Division or Attorney General authorized by this title and any other action otherwise authorized by law, any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title.

(b) *Attorney's fees.*—Any person who brings an action to recover for injury or loss under this section and who is awarded damages may also seek, and the court may award, reasonable attorney's fees."

 In its original form the CPA did not apply to the sale or lease of real property. In 1976, however, the CPA was amended to include "certain real property transactions, certain activities related to these transactions, and certain leases and rentals...." Ch. 907 of the Acts of 1976. *See CitaraManis v. Hallowell,* 328 Md. 142, 150, 613 A.2d 964, 968 (1992). As amended, the CPA now "specifically prohibits any person from engaging in unfair and deceptive procedures in the rental or offer for rental of consumer realty." *Golt v. Phillips,* 308 Md. 1, 8, 517 A.2d 328, 331 (1986). *See* Md.Code (1975, 1990

Repl.Vol.), Comm.Law Art., § 13–301 (defining unfair and deceptive trade practices); *id.* § 13–303 (prohibiting such practices).

 To date, this Court has only applied the CPA in landlord/tenant cases where the unfair or deceptive practice occurred during the establishment of the landlord/tenant relationship between the parties. *See Golt*, 308 Md. at 11, 517 A.2d at 333 (stating that the landlord engaged in a deceptive trade practice because "at the time Golt signed the lease, he cannot be said to have had knowledge that the premises [were] not licensed"); *CitaraManis*, 328 Md. at 149 n. 3, 613 A.2d at 967 n. 3 (stating that "[t]he CitaraManises argue[d] that had they known of the lack of license . . . they would not have entered into the lease . . ."); *Galola v. Snyder*, 328 Md. 182, 185, 613 A.2d 983, 985 (1992) (noting that, in her motion for summary judgment, the tenant claimed that "because the property she rented was unlicensed the lease she had entered with the [landlords] was unenforceable and she was entitled to restitution of all rent paid thereunder"). The landlords in these cases engaged in deceptive trade practices by leasing unlicensed premises without proper notice to the prospective tenants and in violation of various city and county codes.[10] The CPA applies to a lease at the time the consumer enters into it, and the Act is intended to govern deceptive trade practices which induce the prospective tenant to enter into such a lease.

A landlord's acts or omissions during the term of the lease are fully regulated by comprehensive landlord and tenant statutes as well as the common law. Although Maryland's CPA governs deceptive practices involved in the establishment of the landlord/tenant relationship, we do not believe the legislature intended the CPA to be applicable to statements or omissions concerning the leased premises occurring during the

---

10. Although the plaintiffs in each of these cases sought consequential damages such as rent paid and moving expenses during the individual lease terms, each cause of action was based upon a CPA violation which occurred at the time the parties entered into the leases.

term of the lease. A number of decisions from other jurisdictions have refused to apply broad consumer protection acts to any aspect of the residential landlord/tenant relationship in light of more specific statutes with respect to that area. *See Heritage Hills, Ltd. v. Deacon*, 49 Ohio St.3d 80, 551 N.E.2d 125 (1990); *State v. Schwab*, 103 Wash.2d 542, 693 P.2d 108 (1985); *Chelsea Plaza Homes, Inc. v. Moore*, 226 Kan. 430, 601 P.2d 1100 (1979). *Chelsea Plaza Homes* particularly stated the following in this regard:

> "Clearly, the Consumer Protection Act covers a very broad area of transactions; whereas, the Residential Landlord and Tenant Act covers one very specific small area of transactions, and is complete within itself for that area. We therefore must conclude that for all transactions within its purview the Residential Landlord and Tenant Act controls and preempts the field."

226 Kan. at 434, 601 P.2d at 1104.

The Court of Special Appeals' determination that the CPA was applicable to the instant case is not based on the fact that the landlord made a false or deceptive "statement." The intermediate appellate court's holding is based upon the landlords' silence, *i.e.*, their failure to "inform," "disclose," or "give notice" of the premises' allegedly defective condition. *Richwind*, 96 Md.App. at 359–60, 625 A.2d at 341. The Court of Special Appeals also may have suggested that under the CPA a landlord is liable for the nondisclosure of a condition which arose during the term of the lease even if the landlord has no knowledge of the existence of the condition and thus could not inform the tenant of its inherent dangers. *Richwind*, 96 Md.App. at 361, 625 A.2d at 341–42.

The effect of the Court of Special Appeals' decision could be to impose strict liability on landlords throughout the term of the lease. It is noteworthy that courts have identified compelling reasons for refusing to impose strict liability on residential landlords even if such liability is imposed on manufacturers. For instance, in *Young v. Morrisey*, 285 S.C. 236, 329

S.E.2d 426 (1985), the Supreme Court of South Carolina summarized those reasons as follows:

"(1) A landlord is not engaged in mass production whereby he places his product—the apartment—in a stream of commerce exposing it to a large number of consumers; (2) he has not created the product with a defect which is preventable by greater care at the time of manufacture or assembly; (3) he does not have the expertise to know and correct the condition, so as to be saddled with responsibility for a defect regardless of negligence; (4) an apartment includes several rooms with many facilities constructed by many artisans with differing types of expertise, and subject to constant use and deterioration from many causes; (5) it is a commodity wholly unlike a product which is expected to leave a manufacturer's hands in a safe condition with an implied representation upon which the consumer relies; (6) the tenant may expect that at the time of letting there are no hidden dangerous defects known to the landlord of which the tenant has not been warned, but he does not expect that all will be perfect in his apartment for all the years of his occupancy; (7) to apply strict liability would impose an unjust burden on property owners; how can a property owner prevent a latent defect or repair when he has no way of detecting it? And if he can't prevent the defect, why should he be liable?"

329 S.E.2d at 428–29 (citing *Dwyer v. Skyline Apartments, Inc.*, 123 N.J.Super. 48, 301 A.2d 463, 467, *aff'd per curiam*, 63 N.J. 577, 311 A.2d 1 (1973).

It is reasonable to assume that the General Assembly intended to limit application of the CPA to material misstatements and omissions at the inception of the lease rather than during the full term of the lease. At the time the lease is entered into, a landlord has superior knowledge as to the condition of the premises. During the term of the lease, however, when the tenant is in exclusive possession and control of the premises, it is the tenant who has superior knowledge of the property's condition. If we were to hold otherwise, a landlord conceivably could be found liable under the CPA for a dangerous condition created by a tenant during

the term of the lease without any notice from the tenant to the landlord or any opportunity for the landlord to correct it. Such a decision could impose a standard amounting to strict liability for any defect arising on the premises during the term of the lease. We do not believe the legislature intended to extend the scope of the CPA to impose such a standard on landlords.

Although the premises leased in the instant case obviously contained lead-based paint, that alone would not have rendered them uninhabitable or in violation of the CPA.[11] Renting a premises with intact, lead-based paint is not in itself a violation of the CPA. The plaintiff's CPA claims were based on the landlords' failure to disclose that there was peeling, chipping, or flaking lead-based paint which constituted an unsafe condition. There was no evidence that at the time the lease was entered into there was any peeling or chipping paint. As we have indicated, mere silence about a condition that arises during the term of this lease, rather than prior to or at the time the lease is entered into, is not a violation of the CPA. *Cf. Miles v. Shauntee*, 664 S.W.2d 512, 518–19 (Ky. 1983) (holding that failure of a landlord to make repairs required by the housing code is not a violation of the consumer protection act).

In the instant case, the tenants had exclusive possession and control of the premises for two years prior to Richwind taking title. If there was any false or deceptive trade practice involved in leasing these premises, it would have been engaged in by Richwind's predecessor in title, the Baitches, who settled the claims made against them. Consequently, Richwind's post-lease silence does not give rise to a CPA cause of action.

---

**11.** Although intact, lead-based paint is not a violation of the CPA, we note that if, after receiving notice of the condition, a landlord fails to remove lead-based paint from any surface that is easily accessible to a child of a residential premises, the lessee may deposit rent in an escrow account. *See* Md.Code (1974, 1988 Repl.Vol.), Real Prop.Art., § 8–211.1. *See also Fishkind Realty v. Sampson*, 306 Md. 269, 508 A.2d 478 (1986).

Finally, we should point out that the CPA counts sought the same damages for the personal injuries to Jamika and Jamall as the negligence counts, but in addition requested their attorney's fees which are authorized by the CPA. *See* Md. Code (1975, 1990 Repl.Vol.), Comm.Law Art., § 13–408(b) ("Any person who brings an action to recover for injury or loss under this section and who is awarded damages may also seek, and the court *may* award, reasonable attorney's fees." (emphasis added)). The trial judge granted the defendants' motion for judgment on the CPA claims. The Court of Special Appeals reversed the trial court's judgment on the CPA counts, and remanded the case for a new trial on these counts. *Richwind*, 96 Md.App. at 361–62, 625 A.2d at 342. Since the Court of Special Appeals affirmed judgment in favor of the plaintiffs on the negligence counts, whether the plaintiffs could recover for the same injuries under a statutory CPA claim would ordinarily be moot. The intermediate appellate court remanded the case, however, to address the issue of whether attorney fees could be awarded counsel under the Act. *Richwind*, 96 Md.App. at 358, 625 A.2d at 340. The instant case is fundamentally a personal injury action. It is questionable whether the legislature intended to abrogate the long-standing rule that attorney fees are not recoverable in personal injury actions, and to permit plaintiffs who recover tort damages for personal injuries also to recover attorney fees in such actions by bringing them under the CPA. Based on our holding that the CPA is not applicable, we need not reach the issue of whether attorney's fees could properly be awarded in a personal injury tort action based on an additional count which alleges the tort was also a violation of the CPA.

In conclusion, although Richwind and Scoken could be found liable for negligence, they are not in violation of the Consumer Protection Act under the circumstances of this case. For these reasons, we affirm the holding of the Court of Special Appeals concerning the negligence claims, but reverse its holding in regard to Maryland's Consumer Protection Act.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART, REVERSED IN PART. CASE RE-*

*MANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE CIRCUIT COURT FOR BALTIMORE CITY. COSTS TO BE PAID BY PETITIONERS.*

BELL, J., concurs in the result only.